## BROOKS BROS. v. BROOKS CLOTHING OF CALIFORNIA, Limited.

### Civil Action No. 3580–Y.

District Court, S. D. California,
Central Division.

May 5, 1945.

Beekman Aitken, of New York City, and Frank M. Benedict, of Los Angeles, Cal., for plaintiff.

Harry G. Sadicoff. and Pacht, Pelton, Warne, Ross & Bernhard, by Isaac Pacht and Clore Warne, all of Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

I.

The Background of the Controversy.

The action, filed on April 24, 1944, was for trademark infringement and unfair competition. The plaintiff. Brooks Brothers, is a corporation with its principal place of business in the City of New York. The defendant, Brooks Clothing of California, Ltd., is a corporation organized

under the laws of California, with its principal place of business in the City of Los Angeles, California. Both are engaged in the sale of clothing and articles of wearing apparel. The business of the plaintiff is confined chiefly to men's trade, although it sold yard goods to women and some of its articles of apparel, such as boy's sweaters, were in demand by women. The defendant, at the present time, operates fifteen stores in various cities in the State of California. While its chief business is clothing and haberdashery for men, in seven of its stores it sells articles of women's apparel. The plaintiff lays claim to the title of the oldest clothier in the United States. The business it conducts had its beginning in 1818. It was originally conducted by one or more members of the Brooks family in a succession of titles, Henry S. Brooks, Henry S. Brooks & Son, Henry Brooks & Co., H. and D. H. Brooks & Co., and later by the partnership of Brooks Brothers. Finally came the corporation known as Brooks Brothers, the successor of these various individual businesses, incorporated under the laws of the State of New York, on January 12, 1903. The partnership, which existed from 1850 until the organization of the corporation, used the words "Brooks Brothers" as a trade-name and mark. The plaintiff has engaged in interstate commerce for many years. As early as 1850, it advertised goods for the California trade. It conducted, at first, sales through the mails, and from the year, 1930, through representatives, who each year called on a selected California clientele, after announcement of the representative's coming was made through personal notice and advertisements in the newspapers. In 1939, it established sales agencies in Los Angeles and San Francisco. During the years 1924 to 1941, inclusive, its total national and mail order sales were $3,288,112. Its road sales throughout the country for the period from 1923 to 1941 amounted to $6,484,100. On December 21, 1914, the plaintiff applied for the registration of its trademark of "Brooks Brothers," under the Trade Mark Act of February 20, 1905.[1] The certificate was issued on April 20, 1915, and was renewed in 1935.

In this action, the plaintiff charges the defendant with infringing its trademark and with being guilty of unfair competition in the use of a mark similar to its own and of simulating labels. It seeks to enjoin the defendants from using the word "Brooks" either as a part of its corporate name, or as a name designating its business, and for damages for both infringement and unfair competition.

The defendant was incorporated on the second day of July, 1930. For some ten years prior to the incorporation, its business was conducted by a partnership consisting of Harry Greenberg, John Greenberg, Emanuel Greenberg and Albert Greenberg, doing business as Brooks Clothing Company. It first registered its fictitious tradename in Los Angeles County on January 29, 1924. On February 7, 1924, the partnership caused the tradename and the use of the word "Brooks" to be registered with the Secretary of State of California under California Laws. On February 17, 1931, the defendant secured federal registration for its trademark "Brooks Clothing Co." After proceedings instituted by the plaintiff, the Patent Office, through its Examiner of Interferences, cancelled the certificate on March 3, 1944. No appeal was taken from the decision, which is now final. Upon the incorporation of the defendant, the partnership business, tradename and mark were transferred to the defendant corporation, which has used it since. At the present time, it conducts fifteen stores, four of which are in the City of Los Angeles and one each in the following California cities: Long Beach, Huntington Park, Glendale, Pasadena, Santa Monica, Pomona, Santa Ana, San Bernardino, San Diego, Santa Barbara and San Jose. It employs at these various places an average of 450 persons, with seasonal increases at various holiday times, and its sales, in the year 1944, amounted to $5,432,215.33. On its store fronts, in its advertising, both newspaper and radio, and in its circulars, the corporate name of the defendant *is not used*. Instead, the defendant uses the simple word "Brooks" without any prefix or suffix. On some of its labels, and in some of its telephone listings—notably in the New York City telephone directory—the words "of California" are used.

The defendant, in its answer to the complaint, states that it and "its predecessors have been engaged in the clothing business selling men's and ladies' clothing and apparel in the City of Los Angeles

---

[1] 15 U.S.C.A. § 81 et seq.

and the State of California for more than twenty-one years last past under the name of Brooks". And that it has conducted and now conducts stores at the places mentioned under the name "Brooks" and has conducted others at other locations which have now been abandoned. It denies that the conduct of such business is, in any wise in unfair competition with the plaintiff. It asserts that, as a fact, its business is not in competition with that of the plaintiff, and that the plaintiff, by its conduct, has been guilty of laches and waived the right to object to the use by the defendant of "Brooks" as a part of its corporate name and in conjunction with the operation of its business.

Other facts, as disclosed by the pleadings of the parties and by the evidence offered in support of their divergent contentions, will be considered further on in the discussion.

## II.

### Some Inherent Difficulties.

One of the seeming difficulties arising in this case stems from the fact that the Complaint is cast in one claim which combines trademark infringement with unfair competition. Some years ago, I called attention to the fact that, while, since the enactment of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the failure to state claims separately is no longer a ground for dismissal,[2] it was the better practice and more consonant with the requirement of the rules and the spirit of the simpler procedure they inaugurated, to state them separately.[3] This is especially true when some of the fundamental differences between principles applicable to trademark cases and to unfair competition cases are borne in mind. The law of unfair competition is of judicial creation and development. The law of trademarks is purely statutory. It may well be true that a trademark does not create any new rights which the owner of the mark may not have had, or which he could not have protected by court action without registration. Nevertheless, registration confers certain valuable rights—among them, a ready means of proving the registrant's right to the mark, and a presumption of its legality. The law of unfair competition is an offshoot of equity, in its attempt to protect persons engaged in business from the unfair practices of others. It is so broad a concept that authors like Mr. Nims have deplored the adoption of the phrase.[4]

Some of the principles which apply to trademark cases do not apply to unfair competition. The law of damages, for instance, calls for proof of actual loss of sales in unfair competition, while in trademark infringement, presumption of loss is inferred from the proof of use of the mark and evidence of sales.[5] Unfair competition may exist in the absence of a technical trademark.[6] So, when the issues are not clearly drawn, as they would be if the two claims were stated separately, some confusion must arise. Of necessity, some of the principles in these two branches of the law will overlap. This is because, in the last analysis, they may have arisen out of the same background—namely, the desire to protect a

[2] Federal Rules Civil Procedure, Rule 12(b).

[3] Federal Rules Civil Procedure, Rule 10(b); Ford Motor Co. v. McFarland, D.C.Wash.1939, 29 F.Supp. 303. In a famous case, Singer Mfg. Co. v. June Mfg. Co., 1896, 163 U.S. 169, 183, 184, 16 S.Ct. 1002, 41 L.Ed. 118, Mr. Justice White pointed to the confusion which arises from commingling and treating as one, different causes of action, such as trademark infringement and unfair competition.

[4] Nims, On Unfair Competition and Trademarks, 1929, 3 Ed. Sec. 1. And see, Zechariah Chafee's witty analysis, Unfair Competition, 1940, 53 Harv. Law Rev. 1289.

[5] Saxlehner v. Siegel-Cooper Co., 1900, 179 U.S. 42, 21 S.Ct. 16, 45 L.Ed. 77; Straus v. Notaseme Hosiery Co., 1916, 240 U.S. 179, 36 S.Ct. 288, 60 L.Ed. 590; Horlick's Malted Milk Corp. v. Horluck's, Inc., 9 Cir., 1932, 59 F.2d 13, 17; Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381.

[6] G. W. Cole Co. v. American Cement & Oil Co., 7 Cir., 1904, 130 F. 703; Coca-Cola Co. v. Koke Co. of America, 1920, 254 U.S. 143, 146, 41 S.Ct. 113, 65 L.Ed. 189; Trappey v. McIlhenny Co., 5 Cir., 1922, 281 F. 23; Barton v. Rex Oil Co., 3 Cir., 1924, 2 F.2d 402, 40 A. L.R. 424; Warner & Co. v. Eli Lilly Co., 1924, 265 U.S. 526, 531, 44 S.Ct. 615, 68 L.Ed. 1161; Skinner Mfg. Co. v. Kellogg Sales Co., 8 Cir., 1944, 143 F.2d 895, 899.

person in his business or good will. This confusion made it impossible during the trial to draw a strict line in the proof. For certain evidence clearly not admissible in a straight trademark infringement case bore on unfair competition. This led the court to suggest to counsel for the plaintiff, at one state of the proceedings, that he might, in order to confine the proof to narrower channels, waive the claim based on unfair competition and limit himself to trademark infringement. This, he refused to do, as was his right. The amalgamation of the two led the defendant to assert that a trademark case could not be dissociated from unfair competition, and that all the broad principles which Courts have declared in unfair competition cases apply to the trademark infringement issue.

Whatever criticism writers may have directed at some of the concepts which have grown up in this realm of the law, as appears from some of the footnotes to two late Annotations on the subject,[7] this case depends upon principles which are clearly established in the law of this Circuit, and which must control my action. For this reason, cases from other circuit courts will be referred to only when there is no *binding* decision by the Ninth Circuit Court of Appeals. Anyone who has gone through the annotations of Mr. Nims' great work can readily see the bewilderment resulting from an attempt to reconcile the large number of state decisions, or even the large number of federal district and circuit court decisions upon any topic, pertaining to

this subject. This branch of the law, especially the one relating to unfair competition, has been in process of development for almost a century in England and in the United States. The Courts have been concerned chiefly with the pragmatic idea of protecting a person's business and good will against unfair practices of others. And the apparent dissonance in the voices of the courts arose from attempts to justify judicial intervention upon one ground or another. At one time the emphasis was on the protection due to the individual. At other times, the accentuation was on shielding society from deception. But, in the last analysis, what the courts were trying to do, in each case, was to determine whether the particular action of a person was what was the decent thing to do in trade.[8] In this respect, the assertion of counsel for the defendant that each case must stand on its own bottom is correct. But to this extent only. For, ultimately, as a trial judge, I must bear in mind the admonition of a great judge:

"The judge is not to innovate at pleasure. He is not a knight errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' "[9]

And, under the facts in this case, there is no room for cutting new paths for our-

---

[7] 148 A.L.R. 12; 150 A.L.R. 1067.

[8] Apposite are the following:

"Several years ago when Edward S. Rogers, one of the leading American writers and practitioners in the field, was lecturing on Unfair Competition, he asked a student: 'What is your idea of this subject?' He got the answer: 'Well, it seems to me that the courts try to stop people from playing dirty tricks.' Mr. Rogers comments, 'One might spend weeks reading cases and find many definitions less satisfactory than this.'

"Mr. Rogers and his student were too optimistic. There are many dirty tricks in business which the courts do not stop —not at least in private litigation between competitors, for injunctions or damages." Zechariah Chafee: Unfair Competition, 1940, 53 Harvard Law Review, 1289.

"No inflexible rule can be laid down as to what conduct will constitute unfair competition. Each case is in a measure a law unto itself. Unfair competition is a question of fact * * * the universal test is whether the public is likely to be deceived." 63 Corpus Juris 414.

"Obviously, the question of what is unfair competition in business must be determined with particular reference to the character and circumstances of the business. The question here is not so much the rights of either party as against the public but their rights as between themselves." International News Service v. Associated Press, 248 U.S. 215, 236, 39 S.Ct. 68, 71, 63 L.Ed. 211, 2 A.L.R. 293.

And see: Lone Ranger, Inc., v. Cox, 4 Cir., 1942, 124 F.2d 650, 653.

[9] Cardozo: The Nature of the Judicial Process, 1921, p. 141.

selves. For the principles upon which it depends are clearly recognized by the courts. Now to a brief discussion of them.

### III.

#### The Legal Norms Controlling.

Preliminarily, we advert to the fact that the business of the plaintiff has been developed by members of the Brooks family, who established it early in the last century, that without interruption, one or another descendant of the original Brooks was connected with the business and that, at the present time, two great grandsons are on the Board of Directors of the plaintiff.

■ A person has an inherent right to use his name in his business. And this right is recognized in the law of New York and of California, and by federal courts in cases involving trademarks and unfair competition.[10] However, when a person uses even his own name in a manner to create confusion between his business and that of the longer established business of another bearing the same name, the courts will interfere, and, while not depriving the

new-comer entirely of the use of his name in his business, will circumscribe such use by words or phrases indicating clearly that the new-comer's goods do not originate with the older user.[11]

So, at the outset, we are confronted with the situation that the defendant has no natural right to the use of "Brooks" in its corporate name or its business. No man of that name has ever been connected with it. It adopted the name as a convenience. Consequently, as to it, the plaintiff's rights are not even circumscribed as they would be, if dealing with a business using the family name of a natural person who is connected with it.

■ A trademark is merely a method used by a person to designate his goods. It cannot exist independent of a business. It depends on adoption and use, and not on originality or invention.[12] Whatever may have been the rule in the past, the 1905 Trade-Mark Registration Act allows the registration of proper names or words which, prior to its adoption, could not have been made the subject of a trade-mark.[13] It thus confers substantial rights

[10] Brown Chemical Co. v. Meyer, 1891, 139 U.S. 540, 11 S.Ct. 625, 35 L.Ed. 247; Higgins Co. v. Higgins Soap Co., 1895, 144 N.Y. 462, 39 N.E. 490, 27 L. R.A. 42, 43 Am.St.Rep. 769; Royal Baking Powder v. Royal, 6 Cir., 1903, 122 F. 337; Howe Scale Co. v. Wyckoff, Seamans & Benedict, 1905, 198 U.S. 118, 25 S.Ct. 609, 49 L.Ed. 972; Goldwyn Pictures Corp. v. Goldwyn, 2 Cir., 1924, 296 F. 391; Tomsky v. Clark, 1925, 73 Cal.App. 412, 238 P. 950; J. F. Rowley Co. v. Rowley, 3 Cir., 1927, 18 F.2d 704. It should be added that in California a person may, without judicial proceeding, change his name, and acquire property and do business under it. Ray v. American Photo Player Co., 1920, 46 Cal.App. 311, 189 P. 130; In re Useldinger, 1939, 35 Cal.App.2d 723, 96 P.2d 958. This is subject to the limitation that a person or partnership transacting business under a fictitious name or a partnership designation which does not show the names of the persons interested as partners in the business must file and publish the statutory certificate prescribed in such cases. California Civil Code, Secs. 2466–2468.

[11] Restatement of Torts, § 744(d); Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 1908, 208 U.S. 554, 559, 28 S.Ct. 350, 52 L.Ed. 616; Chickering v. Chickering & Sons, 7 Cir., 1914, 215

F. 490; L. E. Waterman Co. v. Modern Pen Co., 1914, 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142; Lloyd Laboratories, Inc., v. Lloyd Bros. Pharmacists, 6 Cir., 1942, 131 F.2d 703, 707; In re Sawyer Electrical Mfg. Co., Cust. & Pat.App.1944, 144 F.2d 893.

[12] In re Trade-Mark Cases, 1879, 100 U.S. 82, 25 L.Ed. 550; Hanover Star Milling Co. v. Metcalf, 1915, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Co., 1918, 248 U.S. 90, 39 S.Ct. 48, 63 L. Ed. 141; Bourjois & Co. v. Katzel, 1923, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464, 26 A.L.R. 567; Prestonettes, Inc., v. Coty, 1924, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731; Imperial Cotto Sales Co. v. N. K. Fairbanks Co., 1921, 50 App. D.C. 250, 270 F. 1686; Treager v. Gordon-Allen, Ltd., 9 Cir., 1934, 71 F.2d 766; General Baking Co. v. Goldblatt Bros., 7 Cir., 1937, 90 F.2d 241.

[13] Thaddeus Davids Co. v. Davids Mfg. Co., 1914, 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046; Rossmann v. Garnier, 8 Cir., 1914, 211 F. 401; Manitou Springs Mineral Water Co. v. Schueler, 8 Cir., 1917, 239 F. 593; Rouss, Inc., v. Winchester Co., 2 Cir., 1924, 300 F. 706, 713; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 331, 332, 335, 59 S.Ct. 191, 83 L.Ed. 195.

on registrants under it.[14]  Among the most important of these is "to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his."[15]  And this extends "to the user of a mark which has acquired a secondary meaning."[16]  Consequently, the courts, in both trademark and unfair competition cases, have held that where the dominant portion of a trademark, tradename or business has become identified in the mind of the public with the first user, he will be protected in the use of the name, even against a new-comer having the same surname.[17]

In making these rulings, the courts have also given practical application to the doctrine of secondary meaning, which seeks to protect "a person against harm to his business which the actor might cause by misleading prospective purchasers into identifying the actor's goods, services or business with those of the other."

The ultimate issue in infringement cases is the likelihood that prospective purchasers will be misled."[18]  Therefore, "one uses a designation in the manner of a trademark or trade name, under the rule stated in Sec. 717, if he so uses it that prospective purchasers are likely to regard it as the name of, or the means of identifying, his goods, services or business."[19]

The principle applies to unfair competition cases and to trademark cases, whether registered or unregistered.[20]  And a secondary meaning may attach to a surname.  This for the reason stated by Mr. Justice Holmes that such a name "may have become so associated with a particular product that the mere attaching of that name to a similar product, without more, would have all the effect of a falsehood."[21]

In the application of these primary norms, certain secondary norms

---

[14] Philco Corporation v. Phillips Mfg. Co., 7 Cir., 1943, 133 F.2d 663, 148 A. L.R. 125.

[15] Prestonettes, Inc., v. Coty, 1924, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L. Ed. 731.

[16] Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 336, 59 S.Ct. 191, 201, 83 L.Ed. 195.

[17] Sweet Sixteen Co. v. Sweet "16" Shop, Inc., 8 Cir., 1926, 15 F.2d 920; Buckspan v. Hudson's Bay Co., 5 Cir., 1927, 22 F.2d 721; Yale Electric Corp. v. Robertson, 2 Cir., 1928, 26 F.2d 972; Western Oil Refining Co. v. Jones, 6 Cir., 1928, 27 F.2d 205; Frischer & Co. v. Bakelite Corp., Cust. & Pat.App., 1930, 39 F.2d 247; Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 1932, 56 F.2d 973; R. H. Macy & Co., Inc., v. Colorado Clothing Co., 10 Cir., 1934, 68 F.2d 690; Phillips v. Governor & Co., etc., 9 Cir., 1935, 79 F.2d 971; Pennsylvania Petroleum Co. v. Pennzoil Co., 1935, 80 F.2d 67, 23 C.C.P.A., Patents 706; R. H. Macy & Co. v. Macy's Drug Store, Inc., 3 Cir., 1936, 84 F.2d 387; Carolina Pines, Inc., v. Catalina Pines, 1932, 128 Cal.App. 84, 16 P.2d 781; Hoover Co. v. Groger, 1936, 12 Cal.App.2d 417, 55 P.2d 529; Wood v. Peffer, 1942, 55 Cal.App.2d 116, 124, 130 P.2d 220; Barnes v. Cahill, 1943, 56 Cal.App.2d 780, 133 P.2d 433; American Philatelic Society v. Claibourne, 1935, 3 Cal.2d 689, 46 P.2d 135; Academy of Motion Pictures Arts and Sciences v. Benson, 1940, 15 Cal.2d 685, 104 P.2d 650; Nims, On Trademarks and

Unfair Competition, 1929, 3rd Ed., Sec. 74.  And see cases under Notes 10 and 11.

[18] Restatement of Torts, §§ 716(b), 717(b).  And see, George W. Luft Co. v. Zande Cosmetic Co., 2 Cir., 1944, 142 F.2d 536, 538.

[19] Restatement of Torts, § 727.

[20] Restatement of Torts, § 716(b); G. & C. Merriam Co. v. Saalfield, 6 Cir., 1912, 198 F. 369; American Trading Co. v. H. E. Heacock Co., 1932, 285 U.S. 247, 52 S.Ct. 387, 76 L.Ed. 740; John B. Stetson Co. v. Stephen L. Stetson Co., 2 Cir., 1936, 85 F.2d 586; Western Auto Supply Co. v. Knox, 10 Cir., 1937, 93 F.2d 850; Little Tavern Shops v. Davis, 4 Cir., 1941, 116 F.2d 903, 905, 906; Weiner v. National Tinsel Mfg. Co., 7 Cir., 1941, 123 F.2d 96, 98; Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, 150 A.L.R. 1056.

[21] Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 1908, 208 U.S. 554, 559, 28 S.Ct. 350, 352, 52 L.Ed. 616.  And see: Anheuser-Busch, Inc., v. Budweiser Malt Prod. Corp., 2 Cir., 1923, 295 F. 306; Vogue Co. v. Thompson-Hudson Co., 6 Cir., 1924, 300 F. 509; Vick Medicine Co. v. Vick Chemical Co., 5 Cir., 1926, 11 F.2d 33; Little Tavern Shops v. Davis, 4 Cir., 1941, 116 F.2d 903; California Fruit Growers Exchange v. Windsor Beverages, 7 Cir., 1941, 118 F.2d 149.

"It is now well settled in this country that a trade-mark protects the owner against not only its use upon the articles to which he has applied it, *but upon*

which have all-important bearing upon the facts in this case, obtain. In infringement, fraud need not be shown, although fraud, or, at least, intent to deceive may be necessary in unfair competition.[22] Nor is palming off or passing off goods on the public an element in unfair competition.[23]

■ One of the difficulties encountered in this branch of the law springs from the use of the word "competition." As a fact, what the law condemns is *unfair practices.* Such practices may exist *where no competition occurs.* As said in one case:

"This is nothing but a convenient name for the doctrine that no one should be allowed to sell his goods as those of another. This rule is usually invoked when there is an actual market competition between the analogous products of the plaintiff and the defendants, and so it has been natural enough to speak of it as the doctrine of unfair competition; *but there is no fetish in the word 'competition.' The invocation of equity rests more vitally upon the unfairness.* If B represents that his goods are made by A, and if damage therefrom to A is to be seen, we are aware of no consideration which makes it controlling whether this damage to A will come from market competition with some article which A is then manufacturing or will come in some other way. The injury to A is present, and the fraud upon the consumer is present; nothing else is needed. This is the principle upon which the two English bicycle cases were decided. Walter v. Ashton, 1902, 2 Ch.Div. 282; Eastman Co. v. Kodak Co., 15 Rep.Pat. Cases 105. It was also at the bottom of our own decision in Peninsular [Chemical] Co. v. Levinson, 6 Cir., 247 F. 658, 159 C.C.A. 560, and of Akron[-Overland Tire] Co. v. Willys[-Overland] Co., 3 Cir., 273 F. 674; Imperial [Cotto Sales] Co. v. [N. K.] Fairbanks Co., 50 App.D.C. 250, 270 F. 686; Aunt Jemima [Mills] Co. v. Rigney [& Co.] 2 Cir., 247 F. 407, 159 C.C.A. 461, L.R.A.1918C, 1039. *We have no doubt it is a sound principle, and should be applied in appropriate cases."* [24] (Emphasis added)

■ For this reason whatever may be the rule in other circuits, the rule declared by our Ninth Circuit Court of Appeals is that competition is not necessary.[25]

---

*such other goods' as might naturally be supposed to come from him.* Aunt Jemima Mills Co. v. Rigney [& Co.], 2 Cir., 247 F. 407, L.R.A.1918C, 1039; Akron-Overland [Tire] Co. v. Willys-Overland Co., 3 Cir., 273 F. 674; Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509; Wall v. Rolls-Royce, 3 Cir., 4 F.2d 333; Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972; Duro Co. v. Duro Co., 3 Cir., 27 F.2d 339." Hand, Judge, in Waterman Co. v. Gordon, 2 Cir., 1934, 72 F.2d 272, 273. (Emphasis added.) And see cases cited under Footnote 17.

[22] Elgin National Watch Co. v. Illinois Watch Case Co., 1901, 179 U.S. 665, 674, 21 S.Ct. 270, 45 L.Ed. 365; N. K. Fairbank Co. v. Luckel, King & Cake Soap Co., 9 Cir., 1900, 102 F. 327, 331–333; Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 1911, 220 U.S. 446, 461, 462, 31 S.Ct. 456, 55 L.Ed. 536; Scandinavia Belting Co. v. Asbestos & Rubber Works, 2 Cir., 1919, 257 F. 937, 958–961; Barton v. Rex-Oil Co., 3 Cir., 1924, 2 F.2d 402, 404, 40 A.L.R. 424; My-T-Fine Corp. v. Samuels, 2 Cir., 1934, 69 F.2d 76; Fawcett Publications v. Popular Mechanics Co., 3 Cir., 1935, 80 F.2d 194, 196, 197; E. Kahn's Sons Co. v. Columbus Packing Co., 6 Cir., 1936, 82 F.2d 897, 900; Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, 419, 150 A.L.R. 1056; G. H. Mumm Champagne v. Eastern Wine Corp., 2 Cir., 1944, 144 F.2d 499, 501–502. And see Note, A.L.R. 1133.

[23] "It is said that the elements of unfair competition are lacking because there is no attempt by defendant to palm off its goods as those of the complainant, characteristic of the most familiar, if not the most typical, cases of unfair competition. Howe Scale Co. v. Wyckoff, Seamans [& Benedict], 198 U.S. 118, 140, 25 S.Ct. 609, 49 L.Ed. 972. *But we cannot concede that the right to equitable relief is confined to that class of cases."* International News Service v. Associated Press, 1918, 248 U.S. 215, 241, 242, 39 S.Ct. 68, 73, 63 L.Ed. 211, 2 A.L.R. 293. (Emphasis added.) And see 248 U.S. at pages 236 and 242, 39 S.Ct. at pages 71 and 73. See also Little Tavern Shops v. Davis, 4 Cir., 1941, 116 F.2d 903; Lone Ranger, Inc., v. Cox, 4 Cir., 1942, 124 F.2d 650, 653; Purcell v. Summers, 4 Cir., 1944, 145 F.2d 979; Nims On Unfair Competition and Trademarks, 3rd Ed., 1929, Sec. 9a.

[24] Vogue Co. v. Thompson-Hudson Co., 6 Cir., 1924, 300 F. 509, 512.

[25] Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 1929, 34 F.2d 774; Horlick's Malted Milk Corp. v. Horluck's, Inc., 9 Cir., 1932, 59 F.2d 13; Phillips v. Governor & Co., 9 Cir., 1935, 79 F.2d 971. Counsel for the de-

## IV.

### The Law Applied to the Facts.

The discussion which precedes makes it evident that we are not confronted with an uncharted domain. On the contrary, the solution of the problems presented by this case lies within a well-defined legal pattern. So we now apply the criteria drawn from adjudicated cases to the facts herein.

It is clear that in the minds of California customers, California tailors and dealers in clothing, the word "Brooks" is identified with the business of the plaintiff. Advertising in magazines of national circulation over a long period of years and solicitation of customers by mail all over the United States, including California, from its early days, has made the tradename nationally known. During the same period, the word "Brooks" alone, without the "Brothers," came to be the identification mark of the plaintiff and its clothes. In fact, it is shown that in certain literary works of the middle of the century, characters were referred to as being "Brooks" tailored or clad in "Brooks" models. There is confirmation of this in the evidence of the defendant. It offered proof that in the clothing business, certain models have become known as "Brooks models," and that dealers have been besieged by customers to duplicate them. This shows the extent to which the name of the plaintiff has become identified with the clothing industry. Even when a word has become generic and its use dedicated to the public, as in the case of "Singer" for sewing machine and "Cellophane" for transparent paper, a competitor will be forbidden to apply it to its product or in advertisements, unless he clearly indicates that the product he is selling is not the product of the originator of the generic term.[26]

Assuming, therefore, that the word "Brooks" could be applied to a model, and that the defendant might state, in its advertising, that it has such models available, this fact would not warrant unlimited use by the defendant of the word "Brooks" to characterize its business.

I have already adverted to the fact that the defendant makes no pretense that it does not use the first word of its corporate name exclusively to identify its business and its clothes. And the fact could not very well be denied, because an examination of its advertisements in the news-

fendant have endeavored to distinguish the language used in these cases on the ground that it applied specifically to the facts in each particular case. But the language of Judge Haney in the case last cited is too clear and emphatic to warrant any doubt. He says:

"This court, however, has carefully considered the question in Del Monte Special Food Co. v. California Packing Corporation, 9 Cir., 34 F.2d 774, and has held that the two products need not be competitive. Many authorities are there cited, to which may be added the following: Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 56 F.2d 973; Wisconsin Electric Co. v. Dumore, 6 Cir., 35 F.2d 555 (certiorari granted 281 U.S. 710, 50 S.Ct. 333, 74 L.Ed. 1132, and certiorari dismissed 282 U.S. 813, 51 S.Ct. 214, 75 L.Ed. 728); American Products Co. v. American Products Co., supra [D.C., 42 F.2d 488]; Finchley, Inc., v. Finchly Co., supra [D.C., 40 F.2d 736]; Anheuser-Busch, Inc., v. Cohen, D.C., 37 F.2d 393; Armour & Co. v. Master Tire & Rubber Co., D.C., 34 F.2d 201; 63 C.J..390, § 100." Phillips v. Governor & Co., 9 Cir., 1935, 79 F.2d 971, 974. (Emphasis added.)

To the cases cited by Judge Haney in the opinion, the following may be added, showing that the rule is not confined to this Circuit: Imperial Cotto Sales Co. v. N. K. Fairbanks Co., 1921, 50 App. D.C. 250, 270 F. 686; Akron-Overland Tire Co. v. Willys-Overland Co., 3 Cir., 1921, 273 F. 674; Yale Electric Corporation v. Robertson, 2 Cir., 1928, 26 F.2d 972; Western Auto Supply Co. v. Knox, 10 Cir., 1937, 93 F.2d 850, 853; Paramount Pictures v. Leader Press, 10 Cir., 1929, 106 F.2d 229, 231; Philco Corp. v. Phillips Mfg. Co., 7 Cir., 1943, 133 F.2d 853, 855, 148 A.L.R. 125; Adolph Kastor & Bros. v. Federal Trade Commission, 2 Cir., 1943, 138 F.2d 824, 826; Dwinell-Wright Co. v. National Fruit Product Co., 1 Cir., 1944, 140 F.2d 618, 622.

[26] Restatement of Torts, §§ 727(b), 728, Singer Mfg. Co. v. June Mfg. Co., 1896, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118; Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; Elgin National Watch Co. v. Illinois Watch Case Co., 1901, 179 U.S. 665, 674, 21 S.Ct. 270, 45 L.Ed. 365; Dupont Cellophane Co. v. Waxed Products Co., 2 Cir., 1936, 85 F.2d 75.

papers, its circulars and radio broadcasts, shows such use. The corporate name of the defendant may well be Brooks Clothing of California, Ltd., but the defendant, long ago, abandoned all the words of the title except "Brooks" in all its methods of seeking custom. Full-page advertisements in local newspapers, dating back to 1935, introduced by the defendant, remove any doubt on the subject. Its listing in the telephone directory is "Brooks". The addition of the words "of California" appears only in its listing in the New York telephone directory and on some labels. And in the combination names, which it has coined for some of its models, and which it uses in advertising them and on labels attached to them, the accent is on "brook", such as in "Holbrook" and "Manbrooke."

But, as the plaintiff, over a long period of years, has used "Brooks Brothers" as a tradename and mark, and has had, since 1915, a federal registration, and the plaintiff and the family which began the business a century and a quarter ago, having used the name "Brooks" in one form or another, which use was accompanied by extensive nation-wide advertising and solicitation of custom and fair dealings with customers in most of the states in the Union, the good will engendered by the word "Brooks" and by these practices belong to it. More, it has created a condition where, to use the language of the Restatement of Torts, "confusion of source" is inherent in the use of the word "Brooks" by anyone but the plaintiff.

The defendant is a *new-comer* in the field. And it *does not* have the right to use the name "Brooks." Its adoption of the name first as a fictitious name for a partnership, under the law of California, and later in its corporate name, could not affect the plaintiff's rights.

While, in this circuit, the interest in a trademark will be protected regardless of actual competition,[27] it is difficult to understand how the competitive character of the two businesses can be disputed. The plaintiff is engaged in selling men's and boy's clothing and related goods. So is the defendant. The defendant may have started as a business featuring a low-price or a one-price suit, ranging from $14 to $25, in years past. But it long ago graduated from that class. Its styles may not appeal to the conservative, but the evidence is plain that it sells men's suits at prices as high as $65.00. And, while the plaintiff's top prices may be higher, it does sell men's clothing within the lower range of the defendant. This fact so obviously means competition that it would seem unnecessary to advert to it. Yet, the ardor of counsel for defendant in contending that there is no actual competition calls for comment. They postulate a differentiation between the businesses based upon the dissimilarity of the merchandise of the two parties and its "appeal" to the different social groups from which they seek custom. You cannot divide the clothing business into categories, according to the social group on which it may depend for patronage. It may well be that a purchaser of clothes chooses to go to one store, rather than to another, because it carries the type of clothes he likes, just as a person may go to a tailor who charges $135 to $150 for a suit of clothes, while another prefer to patronize one who charges $75. But, just as both tailors are in "the tailoring business", regardless of the price, so are both establishments which sell ready-made clothing in the clothing business. To use a phrase made famous by an American humorist, just as "Pigs is pigs," *"Clothes is clothes."* They do not cease to be such because they appeal to one social group rather than another. Nor do the persons engaged in selling them to one rather than another cease to be in the clothing business competitively. Even if the goods be not in competition, the law protects a merchant in his interest "in other goods, services or businesses which, in view of the designation used by the actor, are likely to be regarded by prospective purchasers as associated with the source identified by the trademark or tradename."[28] Here, as the

---

[27] See cases under Footnote 25.

[28] Restatement of Torts, § 730. And see cases under Footnote 17.

"Argument is advanced that the decrees should be upheld because the parties are not direct competitors. Neither defendant operates a store in Tulsa or Oklahoma City, and the defendant in the first case deals in part in second-hand merchandise while plaintiff vends only new merchandise. But both defendants conduct their business in closely connected towns in Oklahoma; they draw trade from territory not remote from the stores of plaintiff and from territory included in the mail order system of plaintiff; and the secondhand merchandise consists

evidence shows, through long use, the word "Brooks" has become identified with the clothes sold by the plaintiff. And the law does not require that there be actual diversion of trade. It is sufficient that the imitation be of a character which is likely to have that result.[29] In considering a case like this, we must take into consideration the habits of the American buying public. Just as Americans are prone to abbreviate names, and Young Men's Christian Association became, first, the Y.M.C.A., and later—especially among the soldiers—the Y, so do they abbreviate longer business names. And Sears, Roebuck & Co. becomes Sears, J. W. Robinson & Co. becomes Robinson's, R. H. Macy & Co. becomes Macy's, John Wanamaker becomes Wanamaker's, Tiffany & Co. becomes Tiffany's, and John B. Stetson becomes Stetson's. More, if a person has achieved successful manufacturing or merchandising in a particular field, the average American, who constitutes our buying public, will identify the name with the product. So Tiffany spells jewelry, Waterman, fountain pens, Ford and Chrysler, automobiles, Hoover, cleaners, Waltham and Elgin, watches, Standard, oil products, Stetson, hats. When, over the radio, we hear the announcement that the Standard Symphony Hour will be heard, we need not be told that it is sponsored by the Standard Oil Company. When a person informs us that he has bought a Ford, he need not add that it was an automobile. And when he buys a Stetson, we know that he is buying a hat. By the same token, one would close his eyes to reality if, in the face of the record in this case, one would hold that "Brooks" does not mean the clothes of "Brooks Brothers" because its customers come from "the classes" rather than "the masses." Ours is an unstratified society with constant mobility of persons. Absent a "caste" system, there can be no "caste" in merchandising. As prospective customers, "the Colonel's lady and Judy O'Grady" (or their male equivalents) "are sisters" (or brothers) "under the skin."

The conclusion is, therefore, inescapable that the plaintiff and the defendant are competing in selling clothes and that, in this field, the word "Brooks" has acquired a secondary meaning to the benefit of which the plaintiff alone is entitled, and in the protection of which, courts will aid.

This conclusion poses a question: Was the adoption of the name "Brooks" by the defendant a deliberate act aiming to appropriate illegally the name and good will of the plaintiff, as the Complaint charges?

There is no substantial evidence in the record that would warrant an affirmative answer to this question. On the contrary, the evidence shows that the choice was fortuitous. The name was suggested by a salesman for a clothing firm, who was selling goods to the defendant's predecessor. The salesman, now engaged in the clothing business in San Francisco, was a witness in the case and verified the story told by the oldest of the Greenberg Brothers. It seems that from a modest start, selling clothes under the name of "Money Back Harry," he was expanding his business. He acquired the merchandise of an insolvent clothing concern. In fear of xenophobia, which might discourage custom from one doing business under the name of "Greenberg," he sought a shorter name. The salesman told him that a friend of his had conducted a very successful business in Denver under the name of "Brooks". The Greenbergs thought of entering business under the name of "Bond's," in the

of accessories and parts for all makes of automobiles. The right to restrain a junior in the field is not confined to cases of actual market competition between identical products. It extends to a case in which one trader represents his products as those of another. *A merchant has a sufficient economic interest in his trade-name to restrain another from exploiting it in the sale of his merchandise, even though the two are not engaged in the manufacture or distribution of the identical or like products.*" Western Auto Supply Co. v. Knox, 10 Cir., 1937, 93 F.2d 850, 852, 853. (Emphasis added.)

[29] N. K. Fairbank Co. v. Luckel, King & Cake Soap Co., 9 Cir., 1900, 102 F. 327; Fuller v. Huff, 2 Cir., 1900, 104 F. 141, 145, 51 L.R.A. 332; Esso, Inc., v. Standard Oil Co., 8 Cir., 1938, 98 F. 2d 1, 6. And see the remarks of Mr. Justice Cardozo in Federal Trade Commission v. Algoma Lumber Co., 1934, 291 U.S. 67, 81, 54 S.Ct. 315, 78 L.Ed. 655. Under the law of California, unfair competition may exist in the absence of fraud. See, California Civil Code, Sec. 3369; Wood v. Peffer, 1942, 55 Cal.App. 2d 116, 124, 130 P.2d 220; Pohl v. Anderson, 1936, 13 Cal.App.2d 241, 56 P.2d 992.

belief that they had the authorization of an Eastern concern doing business under that name. They actually filed a certificate to do business as "Bond's Clothing Co." on November 6, 1920. When they met with protest, they filed a certificate of business under the fictitious name of "Brooks Clothing Company" on January 28, 1924. The defendant produced as a witness the son of A. N. Hirschfield, who exhibited cards and letters indicating that members of his family actually conducted a clothing business as early as 1913 in Denver, Colorado, under the name of "Brooks Clothes Shop." The business was incorporated under that name in 1923, under the laws of Colorado.

Harry Greenberg, who is the oldest of the brothers, and who was connected with the business longer than any of the others, testified, as did the others, that at the time of the adoption of the name, he did not know of the existence of Brooks Brothers. There is nothing improbable about this story, when we bear in mind that he was foreign-born, arriving in this country as a young boy, that he had never lived in New York and that he began a modest business in the comparatively small Los Angeles of the 1920's at a time when Brooks Brothers confined its business in California to mail solicitation and occasional visits of a salesman who called on a selected clientele. At any rate, it has not been contradicted. The plaintiff argues that if he did not know, he should have known. He seeks to have us apply the rule that in law a man is charged with the knowledge of those things which, on inquiry, he could have or should have discovered.[30]

I do not believe the facts in the case would justify a finding of knowledge on the part of the defendant prior to 1930, when Harry Greenberg's visits to New York and his dealings with a clothing manufacturer, Kirschner, who knew of the plaintiff, and who later became associated with him, brought knowledge. The opening of the sales agency by the plaintiff in 1939 brought more direct notice.

This knowledge cannot be retrojected into the past so as to taint with deliberateness and fraud the innocent appropriation of the name "Brooks" in 1924. And had the defendant remained in the humble field in which it began, and had it used its full partnership or corporate name, its innocent adoption might, perhaps, call for denial of relief for unfair competition. It would not affect the trademark infringement, for it is independent of the motive of the appropriator.[31] But the defendant did not remain in the pastures it chose originally. It abandoned, after its incorporation in 1930, its appeals to persons interested in cheaper grades of clothing, and its one-price policy. It has acquired quality in the merchandise it sells, the stores it conducts and the locations at which the business is carried on. In Los Angeles, for instance, it has moved from its Main Street environment to choice locations on Broadway and the famous Miracle Mile of distinctive shops on Wilshire Boulevard. And it ceased, long ago, to emphasize low cost. It now stresses distinctiveness, grade and style. And, in so doing, it uses the word "Brooks" exclusively in advertising, in catalogs, on electric signs, radio and other methods of exploitation of its wares. In this it infringes the rights of the plaintiff, and is guilty of both trademark infringement and unfair competition, regardless of deliberateness or absence of it in the original adoption of the name.

"Indeed there is a kind of fraud, as courts of equity have long perceived, in

---

[30] The Lulu, 1869, 77 U.S. 192, 201, 202, 10 Wall. 192, 19 L.Ed. 906; Wollensak v. Reiher, 1885, 115 U.S. 96, 99, 5 S.Ct. 1137, 29 L.Ed. 350; Ives v. Sargent, 1887, 119 U.S. 652, 661, 7 S.Ct. 436, 30 L.Ed. 544; United States v. Shelby Iron Co., 1927, 273 U.S. 571, 581, 47 S.Ct. 515, 71 L.Ed. 781; Weniger v. Success Mining Co., 8 Cir., 1915, 227 F. 548, 557, 558; Mathis v. Hemingway, 8 Cir., 1928, 24 F.2d 951, 956; Shell Petroleum Corp. v. Corn, 10 Cir., 1932, 54 F.2d 766, 770; McDonald v. Robertson, 6 Cir., 1939, 104 F.2d 945, 948. And see my opinion in Barthelmess v. Cavalier, 1934, 2 Cal.App.2d 477, 492, 493, 38 P. 2d 484.

"For the law imputes knowledge when opportunity and interest, combined with reasonable care, would necessarily impart it. Not to improve such opportunity, under the stimulus of self-interest, with reasonable diligence, constitutes laches which in equity disables the party who seeks to revive a right which he has allowed to lie unclaimed from enforcing it, to the detriment of those who have, in consequence, been led to act as though it were abandoned." Wollensak v. Reiher, 1885, 115 U.S. 96, 99, 5 S.Ct. 1137, 1139, 29 L.Ed. 350.

[31] See cases under Footnote 22.

clinging to a benefit which is the product of misrepresentation, *however innocently made*. Redgrave v. Hurd, L.R. 20 Ch. D. 1, 12, 13; Rawlins v. Wickham, 3 DeG. & I. 304, 317; Hammond v. Pennock, 61 N. Y. 145, 152. That is the respondents' plight today, no matter what their motives may have been when they began. *They must extricate themselves from it by purging their business methods of a capacity to deceive,"* [32] (Emphasis added.)

█ It is axiomatic that a court of equity must determine the issues before it as of the day of determination.[33] The chancellor must adjudicate the equities as he finds them on the day in which he makes his decision. A change in conditions may, even if it does not call for total denial of relief, affect the quantum of relief. Nay, more, it may call for relief in the light of changed conditions which would not have been warranted before.[34]

So far in the discussion, I have stressed the use of "Brooks" as the all-important factor in this case. The reason should be obvious from what I have said. Both in the law of trademark and of unfair competition, the basic right of the plaintiff derives from long use of the word "Brooks" in its original and secondary meaning.

However, certain other challenged practices call for comment.

█ The evidence is too slight to warrant a conclusion of imitation of labels. Such similarity of labels as may exist, is attributable to the patterns of label-makers. The evidence shows that the labels are made in New York, that the maker delivers them to the manufacturers, who place them on the articles of wearing apparel before shipping them to the defendant. The plaintiff has no design patent. In the printing of labels, just as in the printing of books, or in the printing of stationery, there are fashions which govern the

use of a particular type. When one printer begins to use a certain type of lettering, others follow. At one time, Spencerian script was much in vogue for use on business cards. Later, with the advent of cheaper engraving, elaborate imitations of Old English letters made their appearance on cards and stationery. Hence such similarity as may appear in the labels has little bearing on the case. We should not forget that we are dealing with men's clothes and that labels on them are sewed on the inside, and do not have the visual appeal which a label on a bottle, box, can, package or like containers has, and are only incidental to the purchase.

█ Nor was there deliberate copying in defendant's advertising of a double-breasted suit. A double-breasted suit is a double-breasted suit. Styles may change, but a double-breasted suit remains just about the same. Some may be more form-fitting than others, but, in the last analysis, a picture of one is a picture of them all. A comparison between the double-breasted suit exhibited in one of the plaintiff's catalogs with the suit advertised by the defendant, shows the usual three-button double-breasted suit, with the defendant's model more form fitting and revealing a straight line from the waist down, while the plaintiff's is looser in construction and features curved lines from the waist down, which give to it a draped effect. Nor is there any copying of language in the description of the suit. The plaintiff's catalog described a sack suit in this manner: "The first illustration shows a two-button sack suit *(of the soft construction so completely)* identified with Brooks Clothing". The defendant's accused advertisement described a double-breasted coat by this language: "Cut on easy, straight lines, the Brooks model embodies the *(soft construction which is completely)* opposed to any stiffness or over-tailored effect." Counsel for plaintiff point to the similarity of the

---

[32] Mr. Justice Cardozo in Federal Trade Commission v. Algoma Lumber Co., 1934, 291 U.S. 67, 81, 54 S.Ct. 315, 321, 78 L.Ed. 655.

[33] Randel v. Brown, 1844, 2 How. 406, 11 L.Ed. 318; Stonega Coke & Coal Co. v. Price, 4 Cir., 1939, 106 F.2d 411, 419; Stonega Coke & Coal Co. v. Price, 4 Cir., 1940, 116 F.2d 618, 621; Champion Spark Plug Co. v. Reich, 8 Cir., 1941, 121 F.2d 769, 772.

[34] Hardin v. Boyd, 1885, 113 U.S. 756,

5 S.Ct. 771, 28 L.Ed. 1141; Bemis Bros. Bag Co. v. United States, 1932, 289 U. S. 28, 34, 53 S.Ct. 454, 77 L.Ed. 1011; Oil Well Supply Co. v. First National Bank of Winfield, Kansas, 10 Cir., 1939, 106 F.2d 399. All pleading, legal or equitable, now conforms to this equitable principle. See: Clark On Code Pleading, 1928, pp. 179–187; Yankwich, New Federal Rules of Civil Procedure, 1938, pp. 14–15; Federal Rules of Civil Procedure, Rule 15(b).

words in brackets as a striking example of imitation. The answer is obvious. Advertising follows a pattern. The plaintiff's advertisement speaks of "soft construction so completely" identified with its merchandise, while the defendant's advertisement speaks of "soft construction which is completely" opposed to stiffness. The one relates the quality (soft construction) to itself, the other contrasts it with objectionable tailoring. Certainly plaintiff cannot claim proprietary rights in the use of the phrase "soft construction". As one reads the advertisements of today, one is struck by the fact that the advertising writers have run out of adjectives and now fall into clichés. It is as natural to speak of a man's suit as having a certain ease of construction rather than tightness, as to talk about the form-revealing features of women's garments or the sheerness of the material of which they are made. Hence, similarity of the type here discussed may occur without conscious copying. To illustrate: While working on this opinion, I looked through the Sunday edition of a very conservative newspaper of national circulation—The New York Times. I picked up two advertisements of women's clothes by New York firms. The first one was by Stern Brothers. Illustrating the return of the waist line, it advertised a model as *"a cut that ups the percentage of trim waisted, slim hipped women."* The other was by a firm doing business under the name of "Lady Leonora." It featured similar clothes also accentuating the waist line. It read: *"For figure flattery V-midriff."*

In other words, the dominant feature of fashion in clothes, as well as in other merchandise, dictates the terminology of advertising. And as language tends to run into a pattern, it is difficult, when speaking of similar things, to avoid the use of the same words, even in a language so rich as the English language. A phrase once seen by a writer of advertising copy, may linger in his mind to such extent that, *unconsciously,* he may use it in one of his own. Just as in one's writing, one may use phrases which have come from reading them in other's writings. Witness, the currency of phrases like "at long last" or "blood, sweat and tears" after their use by famous personages.

One fact remains unexplained except upon the theory that the defendant was actually attempting to create confusion in the minds of buyers. One of the last set of exhibits introduced at the trial was the "commercials" used on the radio programs. They were admitted without explanation and no disclaimer of their content was made by the defendant. In one of them, dated Sunday, March 18, 1945, the following was used by the announcer as his "first commercial":

"Just as the Brooks Stores have distinguished themselves with civilians, they have earned an enviable reputation among men in the armed services—because Brooks offer good, solid values. *In the first World War, thousands of officers wore uniforms from Brooks*—and today, Brooks Officer's Uniforms are seeing service on land and on sea—in the far corners of the world. The Brooks Uniform shops carry a complete stock of carefully-tailored, approved uniforms, as well as regulation furnishings, officers' insignia and devices. Brooks Stores realize the importance of your time and give special attention to alterations and delivery whenever necessary. The Brooks Uniform Shop in downtown Los Angeles is at 644 South Broadway. In Hollywood, at Hollywood Boulevard and Vine. Others are in Long Beach, San Jose, Santa Ana, Pasadena and San Diego."

As no one connected with the business of the defendant, and certainly not the present corporate defendant or its predecessor, the partnership, which used "Brooks" in its designation, ever engaged in the business of supplying the Armed Forces during the last war, the conclusion is inescapable that the object was to give the impression that the defendant was the same Brooks which had supplied uniforms to the Armed Forces during the First World War. That was palpably untrue. *For the only Brooks which supplied such uniforms was the plaintiff.* In fact, the catalogs in evidence, and other historical, descriptive material, show that the plaintiff took pride in the fact that its military uniforms were of great distinction and had been worn honorably by American soldiers in many wars.

Hence the conclusion that, while there was no *actual* general simulation of the labels or of the advertising material of the plaintiff, there was simulation in this instance. These facts and the simulation inherent in the use of the word "Brooks" entitle the plaintiff to relief.

458

The nature of the relief, however, is affected by the fact that I am of the view that the plaintiff has been guilty of laches. While the plaintiff would have us charge the defendant with constructive notice of its name and business as far back as 1924, the defendant, in turn, urges us to attribute to the plaintiff coextensive knowledge of its own activities over this period of time. In effect, it says that the business was carried on openly and notoriously, advertised so thoroughly, if not blatantly, in the local newspapers, and even in some national publications, and on the air, that the plaintiff should have known of its activities. The answer to this contention is the same we gave to the other.

A finding of knowledge cannot be based on surmise. The offices of the plaintiff are in New York. As it had no local office in California, none of its agents could see the defendant's activities. However, the plaintiff cannot deny knowledge from the date of the opening of its local office in 1939. On September 21, 1939, its agent, Anthony Corso, was designated as a statutory agent on whom process could be served. This gave him an authority beyond that of a mere sales representative. He admitted learning of the existence of a Brooks store in Los Angeles in 1940. It was not until 1943 that he forwarded to New York one of the defendant's advertisements.

In the Los Angeles telephone directory, beginning in 1939, the listing of the defendant's stores was in the same column only a few names above that of the plaintiff. In the classified section of the same directory, where the names are listed according to business, the plaintiff's name appears right under the defendant's. It is incredible that Mr. Corso, in the course of his business, did not see these listings. The stores themselves are located at places where anyone living in Los Angeles and driving, riding or walking on its streets, could not fail to pass them. The constant radio advertising and the appearance in local newspapers of full-page advertisements of the defendant cannot have escaped the attention of Mr. Corso. In fact, if we examine some of these advertisements, it is inconceivable that a person reading these newspapers (and it must be assumed that Mr. Corso has the common American habit of daily newspaper reading) could have turned their pages without seeing the name "Brooks" in bold face.

There is one other fact which, to my mind, indicates that not only Mr. Corso, but the plaintiff's officers as well had knowledge of the existence of Brooks in Los Angeles, at the time, at least, when it established its local agency. Mr. Corso testified that all the business arrangements for the rental of the property and for the installation of the telephone were conducted from New York. There is in evidence an application for telephone service for the plaintiff, made by Mr. Spencer Greason, Treasurer, dated August 7, 1939. It is addressed to the Southern California Telephone Company, and is signed "Brooks Brothers by S. G. Greason, Treasurer." While the application requests that the billing be made to Brooks Brothers, New York, it asks that the listing in the directory be worded, "Brooks Brothers of New York, Clothing." Why the addition of the words "of New York"? They are not a part of the plaintiff's corporate name. It is true that on some of its labels the top bears the words "Brooks Brothers" and the bottom the words "New York". But the preposition "of" does not appear anywhere in the advertising or on the labels. Its listings in the New York City Telephone Directory, dating back to 1935, do not use the words "of New York." The addition of these words to their name, the request for its listing, and its actual listing, beginning in 1939, to date, lead to the inference that the plaintiff, at that time, knew of the existence of the defendant corporation and of its use of the name "Brooks" and that it chose the form of listing as a means of differentiation from it. Such knowledge means duty to act. And its failure to act until 1944, when it began proceedings to cancel the trademark, and instituted this law suit, amounts to laches. This bars relief other than injunction against the future use of the name.[35]

[35] McLean v. Fleming, 1877, 96 U.S. 245, 24 L.Ed. 828; Menendez v. Holt, 1888, 128 U.S. 514, 9 S.Ct. 143, 32 L. Ed. 526; Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 1917, 247 F. 407, L.R.A.1918C, 1039; Middleby-Marshall Oven Co. v. Williams Oven Mfg. Co., 2 Cir., 1926, 12 F.2d 919; Reid, Murdoch & Co. v. H. P. Coffee Co., 3 Cir., 1931, 48 F.2d 817; Gillons v. Shell Co. of California, 9 Cir., 1936, 86 F.2d 600, 608, 609; Grove Laboratories v. Brew-

In this case there is no proof of actual diversion. The only incident of claimed diversion relates to the case of a local bondsman, who, when speaking to a judge, admired his suit, asked where he bought it, and was told "Brooks." The judge was a customer of "Brooks Brothers" and the bondsman of the defendant. Each thought that the other was referring to "his" Brooks. It was clearly a case where, in the language of contracts, there was "no meeting of the minds." The bondsman had patronized the defendant's store for a long time. He did not, following this conversation, go down and buy a suit. Months after, as was the custom, when one of the salesmen at one of the Los Angeles stores informed him that he had some interesting suits, he went down and bought three. The price was sixty-five dollars per suit, but when he demurred at the price, they were reduced to $52.50, one suit being returned and credit being given for the difference.

The plaintiff has offered no proof of actual loss or injury. He is, therefore, not entitled to damages for unfair competition. Nor does the decision of the Supreme Court in Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge & Co.[36] call for damages for trademark infringement. It is to be remembered that the court there was discussing the question of proof. It held that all the plaintiff had to show was proof of sales whereupon the burden shifted to the defendant to show that the "infringement had no relation to profits made by the defendant." Again, the majority of the court said very em-

phatically that the trademark registrant is not entitled to profits "not attributable to the unlawful use of his trademark." The proof in the record here would lead to the conclusion that the plaintiff suffered no injury in its business, and that the profits, if any, were due to the aggressive merchandising methods and the business acumen of the defendant. More, our Circuit Court of Appeals has held that laches bar recovery of damages under the Trade Mark Act of 1905.[37]

## V.

### The Balancing of Interests.

What precedes is determinative of the main issues. However, brief comment should be made on an additional contention of the defendant. Its counsel press on us certain cases which they claim call for denial of all relief on the ground of public interest by resort to a balancing of interests. *The doctrine of balancing of interests is more adequate as an explanation of what a court did in a particular case than as a guide to the court in doing it.*[38]

I believe that the chief cause of disagreement in this case arises from the fact that counsel for defendant have postulated a doctrine of non-competition which is based on the assumption that merchants in the same business who appeal to different social strata are not in competition with each other. This, as we have already pointed out, is an unreal cleavage of the business, especially in this Circuit, where the right to a trademark or tradename will be protected even in the

er & Co., 1 Cir., 1939, 103 F.2d 175; Golden West Brewing Co. v. Milonas & Sons, Inc., 9 Cir., 1939, 104 F.2d 880.

[36] Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381.

[37] Golden West Brewing Co. v. Milonas & Sons, Inc., 9 Cir., 1939, 104 F.2d 880.

[38] Counsel for the defendant attach great importance to the fact that the plaintiff instituted an action against a New York man, doing business as Brook's Men's Shop, in which a consent decree was entered on August 11, 1943, allowing him to conduct business under the name Brook's, Times Square, New York, but making him change the name of the Fifth Avenue store. The action was made the basis of an extended cross-examination in the deposition of one of the plaintiff's officials, who admitted that

a "Brook's" in Times Square, New York, appeals to a different clientele and, therefore, is not in competition with Brooks Brothers. I am still unable to see the significance of these facts. I think the consent decree was improvidently agreed to because the defendant proceeded against was named Brook, and under the law of New York, was entitled to do business under his own name, provided, of course, he did not use it in a way to simulate the business of the plaintiff. (See cases under Footnote 12) Furthermore, I cannot understand how the settlement of a law suit in New York in 1943, and an admission that a certain business does not compete with the plaintiff in New York, can inure to the benefit of the defendant in this case, so as to justify its illegal appropriation of the plaintiff's mark.

absence of competition.[39] More, the doctrine does not find approval in other circuits and is condemned by the Restatement of Torts, which states emphatically that protection will be afforded even in the case of non-competitive goods, business and services, where, because of prior use, "Confusion of source" may result.[40]

Now to the cases alluded to. Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., while nominally one for trademark infringement and unfair competition, was, as the court says, essentially "one of unfair competition." [41] Again, it involved the use by a merchant of his own name in a territory not preempted by another. And the opinion says specifically:

"If one merchant has established a business under his name in wares of one sort, a second merchant may not use that name in selling other wares, if these are so like the first merchant's that the public will be apt to think that the first merchant is selling them." [42]

---

[39] Horlick's Malted Milk Corp. v. Horluck's, Inc., 9 Cir., 1932, 59 F.2d 13. And see cases cited under Footnote 25.

[40] Restatement of Torts, § 730(b). And see cases cited under Footnote 25.

[41] Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., 2 Cir., 1939, 105 F.2d 908, 910.

[42] Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., 2 Cir., 1939, 105 F.2d 908, 910.

The assumption of counsel for the defendant that this case, in some manner, establishes a new landmark in this branch of the law is without foundation. The language used related to the particular facts. For the same court, through the same distinguished judge, Learned Hand, has recognized the doctrine of "confusion of source" and granted relief against it, *even outside of a particular field of exploitation.* In Yale Electric Corporation v. Robertson, 2 Cir., 1928, 26 F.2d 972, 973, Judge Hand said:

"The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject, though it assumes many guises. Therefore it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an ironmonger use his trade-mark? The law often ignores the nicer sensibilities.

"However, it has of recent years been recognized that a merchant may have a sufficient *economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court.* His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful. Aunt Jemima Mills Co. v. Rigney [& Co.], 2 Cir., 247 F. 407, L. R.A.1918C, 1039; Akron-Overland [Tire Co.] v. Willys-Overland [Co.], 3 Cir., 273 F. 674; Vogue [Co.] v. Thompson-Hudson Co., 6 Cir., 300 F. 509; Wall v. Rolls-Royce, 3 Cir., 4 F.2d 333. Although it is quite true that the point is still open in the Supreme Court. Beech-Nut [Packing] Co. v. [P.] Lorillard [Co.], 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810. Again, if originally descriptive, a mark may have been so generally used that it denotes no particular maker, unless narrowly applied. Pabst Brewing Co. v. Decatur Brewing Co., 7 Cir., 284 F. 110. *Here we are dealing with a proper name, which, though it has been used quite generally, is shown to denote the defendant when applied to flash-lights. The disparity in quality between such wares and anything the plaintiff makes no longer counts, if that be true.*" (Emphasis added.)

Judge Hand reasserted the doctrine in Adolph Kastor & Bros. v. Federal Trade Commission, 2 Cir., 1943, 138 F.2d 824, 825, decided subsequent to Emerson Electrical Mfg. Co. v. Emerson Radio & P. Co., supra, in these words:

"The only protective private interest in words of common-speech is after they have come to connote, in addition to their colloquial meaning, provenience from some single source of the goods to which they are applied. The Kastor Company does not assert that the word, 'Scout,' on a pocket knife means anything of the sort; and no such assertion could be sustained, for there is not a shred of

The assumption that because the defendant, beginning in 1924, operated stores in California and used "Brooks" in its business name, it acquired priority in the local market, might apply to one who came later. But "Brooks Brothers" were first in the California trade long before that date. So the argument based on this case cannot hold, unless we adopt the untenable theory that, because they appealed to a different clientele, the doctrine of "confusion of source" does not apply.

S. C. Johnson & Son, Inc., v. Johnson [43] was another "name case". The court applied the principle already discussed that even the use of one's own name will be restricted, if likely to lead to deception.[44]

Dwinell-Wright Co. v. White House Milk Co.[45] and Durable Toy & Novelty Corp. v. J. Chein & Co.,[46] involved trademark infringements. Relief was denied. The court found that there had been long acquiescence and that, from the nature of the cases, no "confusion" *could possibly arise*. It is significant, however, that in the last case, the court recognized that a different rule applied to trademarks which consisted of a personal name. The court said:

"*Where the name is personal* or the mark is coined, it will be hard indeed for the newcomer to find any excuse for invading it, even though his user does no more than *vaguely confuse the reputation of the first user with his own; he has no lawful inter-est in adopting such a mark.*" [47] (Emphasis added)

I fail to see how the defendant can derive any comfort from language like this. "Brooks Brothers" involves the use of a personal name. The defendant has no right to use it. No person named Brooks has ever been connected with its business. So the rule applicable to innocuous trademarks, like those involved in two of these cases—"The White House," "Uncle Sam"—does not help. Nor do statements as to the narrower scope of relief in trademark infringement than in unfair competition. I have already pointed out [48] that trademark registration confers substantial rights. And certainly the decision of the Supreme Court in Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.[49] should dispel any illusions about the narrow limit of rights under trademark registration. For this decision allows damages, as a prima facie case at least, upon mere proof of sales. In unfair competition, proof of actual damage or loss is required.[50] It follows that any general statement that, in reality, trademark registration is of little value fades into insignificance. For, if on infringement of a trademark, you may recover damages without the strict proof required in unfair competition, theoretical distinctions disappear. The realistic owner of a trademark may well "take the cash and let the credit go." Rightly. For, if he can secure damages in trademark infringement without the proof of actual loss

---

evidence in the record to sustain it. Therefore, the decision turns upon whether the suggestion—to put it no more strongly—from the name, 'Scout,' upon a boy's pocket knife that the Boy Scouts of America sponsor it as proper for Boy Scouts, is enough to support the order. We hold that it is; that the Boy Scouts have a cognizable interest in preventing such possible confusion. It is not even necessary that the label shall lead 'boy scouts' to buy Kastor knives supposing that they are 'Official Knives'; boys who are not 'Scouts' may be led to buy them because in their minds they vaguely have the imprimatur of the Boy Scouts of America. That interest the law will protect against an opposing interest no greater than that of all persons in the use of common speech. *We have again and again decided, in cases where a merchant's mark has been used upon goods which he does not in fact sell, but may be thought to be selling, that he may stop the use. No one need expose his reputation to the trade practices of another, even though he can show no pecuniary loss.*" (Emphasis added.)

[43] S. C. Johnson & Son, Inc., v. Johnson, 2 Cir., 1940, 116 F.2d 427.

[44] See cases cited under Footnotes 17, 20 and 21.

[45] Dwinell-Wright Co. v. White House Milk Co., 2 Cir., 1943, 132 F.2d 822.

[46] Durable Toy & Novelty Corp. v. J. Chein & Co., 2 Cir., 1943, 133 F.2d 853.

[47] Durable Toy & Novelty Corp. v. J. Chein & Co., 2 Cir., 1943, 133 F.2d 853, 855.

[48] See cases cited under Footnotes 13 and 14.

[49] Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381.

[50] See, Aladdin Mfg. Co. v. Mantle Lamp Co. of America, 7 Cir., 1941, 116 F.2d 708, 716, 717.

required in unfair competition, he will consider the former the more valuable.[51] However, in view of the conclusion reached that there is here both trademark infringement and unfair competition, although—because of the presence of laches, no relief, other than injunction should be granted—theoretical distinctions lose all meaning.

We conclude that the plaintiff is entitled to injunctive relief as herein indicated. The details appear in the Order filed simultaneously.

---

[51] Perhaps I am responsible for the insistence of counsel upon this point. In the course of the trial, I remarked that even if no unfair competition be shown, the plaintiff might be entitled to the protection of its rights under the trademark registration. This led counsel to assert that the latter is the narrower of the two and conferred fewer rights.