## ARMOUR & CO. v. MASTER TIRE & RUBBER CO. et al.

District Court, S. D. Ohio, W. D. August 1, 1925.

No. 104.

McMahon, Corwin, Landis & Markham, of Dayton, Ohio, for plaintiff.

Toulmin & Toulmin and James & Coolidge, all of Dayton, Ohio, for defendant.

HOUGH, District Judge. Armour & Co. filed its bill of complaint against the Master Tire & Rubber Company for injunctions and accounting. A basis of the remedy asked is unfair competition in the use of the word "Armour" as a trade-name. The bill of complaint was twice amplified by amendment. Later, the Armour Tire & Rubber Company as well as the receivers for both companies were made parties defendant; the Armour Tire & Rubber Company being subsequently organized under the laws of Ohio for the purpose of acting as a selling agency for the Master Tire & Rubber Company. These two companies were engaged in the manufacture and sale, principally by the mail order method, of automobile tires, and perhaps other rubber goods, the business located and operated in the city of Dayton, Ohio.

The defendants filed separate answers, and the cause came on for hearing upon the merits under stipulation that the affidavits filed in the case should be considered as proof by way of deposition.

The defendant companies advertised extensively by means of printed order blanks, printed so-called guarantee bonds, newspaper advertising, display posters, letterhead advertisements, catalogue folders, and the like, upon which appeared prominently and repeatedly and expressions, "Armour Master," "Armour Master Cords," "Armour Cords," "Armour Tire & Rubber Company," cuts of automobile tires showing "Armour Cord" printed in mould on the sidewalls of the tire.

It appears: That the plaintiff company was first organized in 1868 by Philip D. Armour, at Chicago, Ill.; that the business expanded and developed; branch and subsidiary companies were established in numerous large cities in the United States. The Armour family, through various and successive representatives thereof, was continuously identified with the business, and through the successive years large sums of money were expended for the building up of the good will and reputation of the company's products. That the company and its subsidiaries, although primarily engaged in the preparation of meats for consumption, developed the manufacture of other food stuffs and numerous other products, such as glue, sandpaper, curled hair, ammonia, fertilizer, soap, dairy products, the purchase and preparation for market of poultry, the operation of car lines, such as refrigerator and tank cars, and many other lines of industry, among which were certain products and materials used in the manufacture of automobiles and other products incident to the use of automobiles, such as "Armour's Lustre Soap," "Armour's Glycerine" and "Anti-Freeze Solution," "Armour's Motorists and Mechanics Soap Paste," and the like.

Defendants claim the selection of the word "Armour" was for the purpose of signifying the tough, stable, and hardy character of the automobile tires; that is, that the product was in some unaccountable way "armoured," and was calculated to in some way create the impression of strength. The reasonableness of this contention is not sufficiently persuasive to even require comment.

The inescapable conclusion, drawn from the tenor of the entire record, is that the use of the word "Armour" in the corporate name of the selling company, and as a brand and trade-name to the product, was selected for the purpose of taking advantage of the business reputation of the plaintiff company, the family name of the organizer, and of those prominently interested in that company throughout its existence, in the good will of that company gained by years of ingenious advertising and the expenditure of vast sums of money therefor, and for the purpose of confusing the public and leading defendant's patrons to believe by the use of the word "Armour"; that its product was of a superior standard and quality, and to induce other members of the public to become patrons under such a belief. Fraud, or the attempt at fraud, is discernible as the underlying and appealing conclusion.

True it is that the plaintiff in all its history and in the development of its varied products of manufacture has never engaged in the manufacture of automobile tires. There is no absolute and direct competition in this field. Under the modern trend of judicial decision, this direct competition is not a necessary element. The trend has been to distinguish the character of case we have here from the trade-mark cases, and to deal and classify the issue where it belongs, viz. under fraud. By no means the least to concern a court in such a case is the consideration of the question of how has, and how will, the continued act affect the public.

The Court of Appeals in the Third Circuit, in the case of Akron-Overland Tire Co. v. Willys-Overland Co., 273 F. 674, 676, says:

"While it may be conceded that the plain-

tiff company manufactures automobiles and the defendant does not, and while the plaintiff does not make or sell automobile tires, and the defendant retreads and sells tires, and in exact terms the two do not compete in these particular things, yet the fact remains that the business of both is so connected with automobiles that the public, in buying the stocks, securities, and retread tires of the defendant company, by the use of the word 'Overland' in connection therewith, will, by such descriptive word, be led to believe it is buying property or articles owned or dealt in by the plaintiff or one of its subsidiary companies."

And the court furthermore says:

"With a practically unlimited field of distinctive names open to it for choice, when the defendant lately entered the automobile industry, the fact that it chose to take a name that had no connection or association with the automobile trade, except the good will and association which the plaintiff had given it, shows conclusively that the name was given to this new venture in the automobile field because of its established high regard in that industry, which had been given it by the plaintiff."

And again the Court of Appeals of our own Circuit, in the case of Vogue Co. v. Thompson-Hudson Co. and others, 300 F. 509, at page 512, have this to say, speaking of unfair competition and fraud as the provocative cause for the invocation of equity jurisdiction:

"This rule is usually invoked when there is an actual market competition between the analogous products of the plaintiff and the defendants, and so it has been natural enough to speak of it as the doctrine of unfair competition; but there is no fetish in the word 'competition.' The invocation of equity rests more vitally upon the unfairness. If 'B' represents that his goods are made by 'A', and if damage therefrom to 'A' is to be seen, we are aware of no consideration which makes it controlling whether this damage to 'A' will come from market competition with some article which 'A' is then manufacturing or will come in some other way. The injury to 'A' is present, and the fraud upon the consumer is present; nothing else is needed. * * * Walter v. Ashton (1902) 2 Ch. Div. 282; Eastman Co. v. Kodak Co., 15 Rep. Pat. Cases, 105."

The same underlying reasoning is employed in the case of Peninsular Chemical Co. v. Levinson and others (C. C. A. 6) 247 F. 658.

The same reasoning prompted the decision of a very recent case entitled Howard Wall v. Rolls-Royce of America [4 F.(2d) 333], handed down by the Circuit Court of the Third Circuit. October term, 1924.

Permanent injunction may issue as prayed for. Entry may be presented accordingly, carrying costs for plaintiff.