**G. B. KENT & SONS, LIMITED, v. P. LORILLARD CO.**

Civ. No. 80–296.

United States District Court
S. D. New York.

Aug. 11, 1953.

Lewis & Mound, New York City, Milton N. Mound, Richard Wincor and Herbert F. Schmelzer, New York City, of counsel, for plaintiff.

Campbell, Brumbaugh, Free & Graves, New York City, Walter H. Free, Thomas L. Perkins, Robert McCormack and James N. Buckner, New York City, of counsel, for defendant.

WEINFELD, District Judge.

G. B. Kent & Sons, Ltd., an English concern, brings this action against P. Lorillard Company, a New Jersey corporation, alleging trademark infringement and unfair competition. Plaintiff seeks to enjoin the defendant from using the name "Kent" in connection with the sale and distribution of cigarettes and from using white and gold coloring with the design of a castle on packages or containers of cigarettes. The defendant counterclaims for a declaratory judgment that plaintiff has no title to "Kent" as a name for cigarettes or other tobacco products, that defendant's use of "Kent" does not infringe any of plaintiff's trademark rights, and that defendant's sale of cigarettes under the name of "Kent" is not likely to mislead the public into believing that the Kent cigarette is manufactured and sold by the plaintiff.

Both sides move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. The motions are based upon the pleadings, affidavits, extensive depositions taken before trial of various principal representatives of the litigants, and many exhibits. The parties are in agreement that no dispute exists as to the controlling facts and that the matter is ripe for summary judgment. In their joint desire to secure a determination under Rule 56, they advised the Court that if any triable issue of fact should be found, they were prepared to stipulate with respect thereto. Subsequently, upon the Court's drawing to their attention possible issues of fact, they entered into a stipulation which will be referred to in more detail later on.

Plaintiff was incorporated in 1900. It is the successor to the "House of Kent" founded in England in 1777 by William Kent and continued thereafter through five generations of his male heirs.[1] It is from this family name that the trademark rights in "Kent" are derived. Plaintiff's primary business has always been the making and selling of the highest quality combs and brushes (including hair, shaving, tooth, nail, and paint brushes), although at various periods it has sold other products.[2] Plaintiff's merchandise has been sold under its trademark in every civilized country of the world—as its managing director put it, from "Aden to Zanzibar." In the United States, its products are sold to Cosby Brush and Import Co., Inc. (hereafter called "Cosby"), a New York corporation; Cosby in turn sells to various retail outlets.

Since 1777 in England and 1878 in the United States, plaintiff has used the trademark "Kent" upon its products. In 1931, a subsidiary of plaintiff obtained a certificate of registration of its mark, "Kent", for various brushes.[3] In February, 1951, the registration was renewed to plaintiff.

1. Hereafter, plaintiff's predecessors are included in the appellation "plaintiff".

2. Such products presently include mirrors, nail files, and wallet cases.

3. This was filed in Class 29 of the Patent Office and covered toothbrushes, hairbrushes, handbrushes, bath brushes, clothes brushes, hat brushes, shaving brushes, complexion brushes, and military brushes.

Unquestionably plaintiff has attained a world-wide reputation in the field of brushes; it has built up a substantial good will in the name "Kent" and has imbued it with a secondary meaning as to the products plaintiff manufactures. The high quality of its merchandise is attested to by many prizes and awards at trade expositions and by warrant issued by the royal family of England. However, plaintiff has catered to a luxury group of customers and in consequence the distribution of its product has been limited. Its sales policy has been away from mass distribution concepts. To avoid the impairment of its reputation it has restricted the retail outlets, in which its products are sold, to those of the "highest class".

Plaintiff's advertising campaigns though steady through the years have involved modest expenditures. Thus, from 1947 to 1952, the sums spent on all advertising, including that spent by its customers for cooperative advertising, was $250,000, an average of less than $50,000 per year. To this might be added the value of display advertising in various stores which sell plaintiff's products.

Since 1950 the average dollar volume on sales in the United States "has exceeded" $750,000 annually. More precise figures of sales in the United States have not been submitted.

The name "Kent" is stamped on each item sold by the plaintiff. Most of plaintiff's products are packaged in distinctive designs and colors—among which are boxes colored with broad vertical gold and white stripes bearing the design of a castle or crown. The plaintiff charges that the defendant has not only misappropriated its trademark, but also has simulated this design.

Defendant, P. Lorillard Company, whose business was established in 1760, is the manufacturer of brand name cigarettes including "Old Gold" and "Embassy" and other tobacco products. The Kent cigarette was not marketed by the defendant until March, 1952. Prior thereto, from May to October, 1950, the defendant was engaged in developing a new filter type cigarette.

During the process of development, Robert M. Ganger, then Executive Vice-President of the defendant, with considerable advertising agency experience, selected the name "Kent" for the new filter cigarette. The various factors which led to the choice of name are discussed hereafter, but one reason was to honor Herbert A. Kent, then President of the defendant and soon to retire after more than 25 years association with the defendant. At the time, October 1950, neither Kent nor defendant's advertising director, Alden James, were consulted by Ganger. The naming of the cigarette in honor of Kent was intended as a surprise to him and the proposed use of his name was not to be divulged nor his consent requested until it was clear that the name "Kent" on cigarettes would not be violative of the rights of third parties. Also, in October of 1950, when it was concluded that the new filter cigarette was desirable for marketing, counsel for the defendant were asked to investigate the availability of the trademark "Kent". After investigation, they concluded that only one registered trademark, "Kentwood", issued for tobacco, offered possible conflict with "Kent" on cigarettes, and after protracted negotiations the defendant purchased an assignment of it.

Early in 1951 after counsel had concluded that the name was available, Herbert Kent was asked to give his consent to the use of his name, and in June, 1951, James was told of the decision. It appears that both Kent and James, unlike Ganger, knew of plaintiff's use of "Kent" on its brushes, but each felt that the yet unmarketed cigarette was so dissimilar from plaintiff's products that there was no possibility of confusion—a view which, of course, had the concurrence of defendant's counsel.

On March 26, 1952, the "Kent" cigarette was formally introduced to the public. The initial sales were launched with double page advertisements in the major newspapers in New York City, Chicago, and Los Angeles. An intensive newspaper campaign followed in other cities. Later, television programs were also included in the promotional program. Total advertisement expenditures during 1952 for the new cigarette amount-

ed to approximately $1,550,000 and the sale of Kent cigarettes has been in the hundreds of millions.

Prior to the large-scale launching of the cigarette, the defendant in January, 1952, had sold nominal quantities in interstate commerce under the name of "Kent" and filed an application for its registration as a trade-mark for cigarettes in the United States Patent Office, which was refused "for the reason, that the word 'Kent' which comprised the mark is primarily a surname."[4] After the defendant had undertaken its large-scale selling and promotional program and had made distribution of the cigarette in thirty-four states and the District of Columbia, it filed affidavits setting forth the facts and requested registration under Section 2(f) of the Lanham Act upon the ground that "Kent" had become distinctive of defendant's cigarette.[5] Thereafter, in April, 1953, registration of "Kent" as a trademark for cigarettes was approved and a certificate of registration duly issued by the Patent Office to the defendant.

Plaintiff claims that it first learned of Kent cigarettes in October, 1952, when its managing director arrived in the United States on a business trip. Shortly thereafter, on October 31, 1952, a little over seven months subsequent to the formal introduction of the cigarette, the defendant was notified of the plaintiff's claim of infringement. On November 11, 1952, after a discussion between counsel for both parties which proved abortive, plaintiff commenced this action.

Jurisdiction is based upon the Lanham Act[6] and diversity of citizenship[7] with pendent jurisdiction upon the claim of unfair competition.[8] I need not discuss which law, State or Federal, is applicable to this case, for the Court of Appeals for this circuit has recently said that " * * * the state law is not at odds with our own cases * * *."[9]

Defendant's basic argument in reply to plaintiff's claim of infringement and unfair competition is that the products are so dissimilar and remote they are not in competition and that there is no likelihood of confusion. Plaintiff urges to the contrary that there is likelihood of confusion and contends that even if there were none, it is still entitled to legal protection of its interest in preventing "dilution" of its trademark "Kent".[10]

Plaintiff's right to injunctive relief under the Lanham Act[11] depends upon a finding that the defendant's use of "Kent" on cigarettes " * * * is likely to cause confusion or mistake or deceive purchasers as to the source of origin of such goods * * *."[12] The fact that the products are not identical does not excuse if they are sufficiently similar to make confusion likely.[13] Plaintiff need not show that some persons actually did believe that defend-

---

4. Sec. 2(e) (3) of the Lanham Act, 15 U.S.C.A. § 1052(e) (3).

5. 15 U.S.C.A. § 1052(f).

6. 15 U.S.C.A. §§ 1114, 1121.

7. 28 U.S.C.A. § 1332.

8. 28 U.S.C.A. § 1338(b).

9. Hyde Park Clothes v. Hyde Park Fashions, 2 Cir., 204 F.2d 223, 226.

10. See Philadelphia Storage Battery Co. v. Mindlin, 163 Misc. 52, 296 N.Y.S. 176; Schechter, "The Rational Basis of Trademark Protection", 40 Harv.L.Rev. 813, 825 (1927). But compare Time, Inc. v. Life Color Laboratory, 279 App.Div. 51, 107 N.Y.S.2d 957, Affirmed 303 N.Y. 965, 106 N.E.2d 56.

11. 15 U.S.C.A. § 1114(1).

12. Likelihood of confusion is and has been the test of both trademark infringement and unfair competition claims. See American Automobile Association v. Spiegel, 2 Cir., 205 F.2d 771; Admiral Corp. v. Penco, Inc., 2 Cir., 203 F.2d 517; Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602; Federal Telephone & R. Corp. v. Federal Television Corp., 2 Cir., 180 F.2d 250; Standard Brands v. Smidler, 2 Cir., 151 F.2d 34; Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969; Eastern Const. Co. v. Eastern Engineering Co., 246 N.Y. 459, 462, 159 N. E. 397; Philadelphia Storage Battery Co. v. Mindlin, 163 Misc. 52, 296 N.Y.S. 176.

13. Admiral Corp. v. Penco, Inc., 2 Cir., 203 F.2d 517, 521 and cases cited therein.

ant's cigarettes emanated from plaintiff.[14] The test is the likelihood that an appreciable number of ordinarily prudent purchasers will be confused.[15]

Evidence of defendant's bad faith and of an intent to palm off its product as that of the plaintiff, or to trade on the latter's good will may be strong evidence of the likelihood of confusion.[16] In the absence of fraudulent intent, however, the Court must rely upon other criteria, such as the strength of the plaintiff's mark (i. e. the extent to which similar trademarks were issued and are used by others on various products),[17] the area of concurrent sale, the extent to which the goods are related and the extent to which the trademarks are like each other. It is in the light of the foregoing that the facts must be evaluated.

The question which first intrudes itself, is how did it come about that the defendant selected the name "Kent" for its new product? The man who seems to bear the responsibility for the decision, Ganger, swore that four considerations induced him to choose this name:

(1) Herbert A. Kent, the retiring President of the defendant, was one of the most respected men in the tobacco business. Ganger felt that no greater tribute could be paid to Herbert Kent than to name a fine product after him.

(2) Naming the product after Kent would enlist the enthusiastic support of the wholesale tobacco trade. Such support would substantially aid in securing a favorable reception to the new cigarette from the retail trade.[18]

(3) Ganger believed that a short word was desirable as the name of the product.

(4) "Kent" followed the "scheme of things" in the cigarette industry, it being a name of English extraction. Cigarette products generally in the past years had emphasized names associated with England; for example, Chesterfield, Pall Mall, Phillip Morris and Parliament.

Ganger has sworn that these factors, and these alone, led to the selection of "Kent" as the name for defendant's cigarettes. He categorically denies that the purpose was to trade on plaintiff's name or good will or that he had ever heard of plaintiff's product prior to February, 1952, when he saw it in a store in Georgia. He says that he had known of other disparate products sold under the name of "Kent". Indeed the parties have stipulated that there was no fraudulent intent on the part of the defendant in adopting "Kent" for its new cigarette.[19] Hence there is no question in this case of an intent to palm off "Kent" cigarettes as emanating from the plaintiff, or to capitalize on its good will.

Quite the contrary, a purpose to trade on plaintiff's trademark is at once repelled by the fact that the defendant, to acquaint the American public with the name "Kent" in relation to cigarettes, embarked upon an extensive advertising campaign, spending more than $1,500,000 in 1952. Had the plaintiff's trademark and name been universally known to the consuming public, this vast expenditure, in large measure,

---

14. LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115; Admiral Corp. v. Penco, Inc., 2 Cir., 203 F.2d 517, 520.

15. Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602; Eastern Wine Corporation v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955, 960; Standard Brands v. Smidler, 2 Cir., 151 F.2d 34.

16. Best & Co. v. Miller, 2 Cir., 167 F.2d 374, 377; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272, 273.

17. Federal Telephone & Radio Corp. v. Federal Television Corp., 2 Cir., 180 F.2d 250, 252; Sunbeam Furniture Corp. v. Sunbeam Corp., 9 Cir., 191 F.2d 141, 144.

18. Upon this record the reasons for the selection of Kent's name is not in dispute. Hence, this is not a case where the alleged infringer makes use of a corporate officer's or stockholder's name to give plausibility to an obvious attempt to trade upon the first user's good will. Accordingly, the cases cited by plaintiff holding that the use of the name cannot be justified upon this ground in such circumstances are not in point.

19. This was one of the fact stipulations entered into by the parties upon the Court directing attention to a possible issue of fact on this subject.

would have been a needless waste of funds. The situation here presented appears to be the reverse of the free ride motive generally encountered in piracy situations where an unknown distributor seeks to capitalize on a nationally known and well-advertised name or product. Of course financial power and its exercise serve as no excuse for infringing on the rights of others; and if a violation were found to exist, the circumstance that defendant had spent more than a million dollars in advertising its new product would not serve to protect it. Indeed, it would serve to aggravate the offense. The extensive advertising program of the defendant is mentioned here merely to emphasize an absence of purpose on the defendant's part to cash in on a name that someone else had made famous. However proud plaintiff may be of its name and product, the fact remains that Kent brushes are unknown to the mass purchasing public. The conclusion is compelled that the name was not selected to palm off defendant's product as plaintiff's or as originating with any producer other than the defendant.

█ Nor does the evidence reveal the existence of actual confusion by purchasers of cigarettes as to their source. It is of significance that although plaintiff's and defendant's products are sold in 128 drugstores in New York City, not a single affidavit has been submitted of any instance of confusion or mistake on the part of any retailer as to the origin of either product. It is of no less significance that no affidavit has been presented of any customer indicating confusion or the belief that "Kent" cigarettes were the product of the plaintiff. Finally, the plaintiff has stipulated the absence of any instance of actual confusion.[20]

Thus, the case is narrowed to a consideration of other criteria to determine whether likelihood of confusion exists. Plaintiff urges that such a likelihood may be inferred not only from the fact that the same name is used upon both products, but also—and with specific reference to the claim of unfair competition—from the gold and white stripes and castle on defendant's packaging, both of which plaintiff contends are suggestive of British origin. Consumers knowing that plaintiff is a British manufacturer will inevitably infer, so the argument runs, that the cigarette, in some way associated with Great Britain because of the castle and the coloring taken together with the name, is produced by plaintiff.[21]

Plaintiff also makes much of the fact that the defendant's name, P. Lorillard Company, is not displayed upon the front of the package; further, because both plaintiff's and defendant's products are sold, in some instances, in the same retail outlets, that the cigarette customer will be misled into believing that they originate with the plaintiff. As a corollary to this position, the claim is that the defendant, having priced its "Kent" cigarettes at 32 to 35¢ a package, appeals primarily to plaintiff's selective clientele—those willing to pay high prices. Finally, plaintiff asserts that "Kent" cigarettes might plausibly be supposed by some to emanate from plaintiff because of the modern phenomenon of "expansion of once limited companies into new fields and the appearance of their distinctive trademarks upon increasingly disparate and unrelated products".

These hypothetical projections must give way to the facts of the immediate case. Upon all the evidence I find that likelihood of substantial confusion is extremely remote. Recognizing that ordinarily instances of actual confusion are difficult of proof,[22] still I cannot ignore that, with millions of cigarettes having been sold

---

20. This stipulation makes it unnecessary to consider the ambiguous statement contained in the Haas affidavit.

21. In this connection, plaintiff refers to decisions of the Federal Trade Commission issuing cease and desist orders against enterprises which had deliberately fostered the impression that the wares they sold were manufactured in Great Britain. Such is not the case here; rather, defendant's use of "Kent" was motivated, among other things, by a desire to give its product a British "tone", in the apparent belief that such a tone carries with it an implication of high quality. Hence, reliance upon Section 1126 of Title 15 is likewise misplaced.

22. Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, 603.

side by side with Kent brushes for the past 18 months, throughout the United States no single instance of actual confusion has been presented. Cigarettes and brushes are too dissimilar for any appreciable number of prudent purchasers to think that since both are called "Kent" the same manufacturer produces both. This is not, as I have said, a case of a trademark so widely and intensively advertised and nationally known as Ford, Tiffany, Du Pont or Bulova. Plaintiff's attempt to equate its standing to such household names must fail for lack of substance. Its products are luxury items, are purchased by a limited number of persons, have not achieved mass distribution, have not been advertised extensively and are not well known to the consuming public. Plaintiff not only concedes but stresses that its brushes appeal to a select clientele. This in large measure, as far as the mass purchasing public is concerned, eliminates common identification of the name "Kent" with plaintiff or its products.[23]

On the question of likelihood of confusion still other factors are to be considered. "Kent" is a common geographic name as well as a surname.[24] Further, while "Kent" may have attained a secondary meaning in the field of brushes, the name has also been identified in this country, and abroad, with a variety of products—and so there has been substantial dilution of the trademark. Many enterprises over the years have manufactured and distributed products under the name "Kent". For example, "Kent" either alone or in conjunction with other words or symbols has been registered as a trademark thirty times in the United States Patent Office by others than the defendant or the plaintiff. Registrations have been granted for luggage, gloves, blankets, men's and boys' clothing, pens and pencils, silverware, coffee, ale, flints, shirts, collars, rubber heels and soles, watches, photographic accessories and knives—some to leading American department stores and distributors. In addition to others who have used the name on disparate products, Kent Luggage, Inc., in New York City has, since 1936, distributed under the name of "Kent" luggage and luggage accessory products, clearly allied to plaintiff's. Further since 1946, this company has sold Kent brushes (purchased from plaintiff's sales representative Cosby in New York City) together with its own products.

"Kent" has also been registered by others in foreign countries and incidentally used on cigarettes as well as other products. The name was registered in 1935 in Denmark by the American Tobacco Company for tobacco products, and in Sweden in 1940 by the Tobacco Monthly of Sweden, also for tobacco products. Closer to plaintiff's home, we also find that in 1923 an English concern registered the trademark "Ken" for tobacco in Great Britain.

Plaintiff replies that these uses and registrations both here and abroad were unknown to it or that they were insubstantial. In the instance of the luggage product in New York City, its failure to protest was due, it says, to negligence on the part of its American distributor. Plaintiff states that defendant's action represents the first substantial menace anywhere in the world to the public's identification of the trademark "Kent" with its products. Of course prior wrongdoing by others, if in fact plaintiff's rights were violated, does not justify current invasion of its rights. But to the extent that "Kent" has heretofore been associated in the public mind with a variety of products, with other persons and with other places, its strength as a trademark has been weakened and there is less likelihood that the public will be deceived into thinking that the defendant's cigarettes are manufactured by the plaintiff.[25]

23. It is recognized that a luxury item may be nationally known to the mass purchasing public but the record here does not support this claim as far as plaintiff's product is concerned.

24. In the United States there are 24 communities and 5 counties named Kent. The current telephone directories of the five largest cities in the United States contain 1,035 listings under the name Kent, including some 257 business or trade names.

25. Cf. Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, 974: " * * * if originally descriptive, a mark may have

■ We next consider plaintiff's argument relative to packaging. The basic plea is that here there is an attempt to simulate both the name of the senior user and its locale; that plaintiff is threatened not only with the loss of position as senior "Kent" but also as the "British Kent". On both packages there is the design emblem of a British figure; on the plaintiff's a crest; on the defendant's a castle. Both wrappers are colored white and gold.

The facts as to the origin of the design of the defendant's package may be briefly stated. The defendant, during the process of the development of the filter cigarette, engaged the services of experts in packaging. Many designs and suggestions were considered and finally the number narrowed to four. The first three were substantially identical except for background color which was red, olive green and white respectively. The fourth was of a tweed design. All four contained a figure of a castle. The final selection was of the white package with thin gold horizontal stripes, the one now complained of by plaintiff. The reasons assigned for this selection are that (1) it followed the current trend in the cigarette industry; (2) it made the package seem larger; (3) it seemed particularly appropriate as a new type filter was to be featured, and white denoted cleanliness and purity.

Upon all the facts I find that plaintiff's contentions relative to packaging are without merit. There is, in the first place, no proof that gold and white are suggestive either of British origin or of the plaintiff. A visual examination of plaintiff's and defendant's packages reveals there is no chance of confusion—there is a complete lack of similarity. Moreover, most of plaintiff's products in this country are packaged in red containers rather than in containers of white and gold broad stripes

and in this situation it is unrealistic to suggest that customers will associate the defendant's cigarette package with plaintiff's packages. As to defendant's use of a castle, it is unlike the emblem appearing on plaintiff's packages. It does suggest royalty—a symbol common to, and extensively used in, present day cigarette merchandising. The defendant, as well as its competitors, have used this design on cigarette wrappers.[26]

As to the further arguments of likelihood of confusion because of the sale of the plaintiff's and defendant's products in the same retail outlets and modern phenomenon of expansion by producers into new and unrelated fields, these are overcome by the factual situation of this record. The public is not likely to be deceived or confused as to the origin of the defendant's cigarettes.

■ The plaintiff next contends that even in the absence of likely confusion it is entitled, as the senior trademark owner, to protection with respect to goods it has not previously exploited. Stated in broadest terms, it claims that it has pre-empted the name "Kent" on a world-wide basis, not alone with respect to brushes and other products theretofore and now sold under its tradename, but also with respect to any other product, whether or not directly related to its current output, which, under modern merchandising methods, may be sold in those retail outlets distributing plaintiff's wares. It asserts that even if it never did business in the United States, it is still entitled to enjoin the defendant. The claim is much too broad. Undoubtedly a senior user may be entitled to protection with respect to noncompetitive products, but the right is not absolute. The Court of Appeals for this circuit recently defined[27] the interests of a party seeking to enjoin the use of a mark on goods on which he never previously used it as: "(1) the possibility that

been so generally used that it denotes no particular maker, unless narrowly applied."

26. I find little substance to the claim that defendant's failure to stamp the name P. Lorillard Co. on the front of the cigarette wrapper, instead of on the side where it appears, manifests a purpose to

indicate British origin. The fact that the name P. Lorillard Co. appears on the wrapper rebuts any such purpose. Moreover, in its television broadcasting programs defendant's sponsorship of the cigarette is emphasized.

27. Hyde Park Clothes v. Hyde Park Fashions, Inc., 2 Cir., 204 F.2d 223, 225.

trade practices of the defendant may stain the reputation of the plaintiff in the minds of his customers; and (2) the possibility that some time in the future the plaintiff may wish to extend his business into the market which the defendant has already begun to exploit. These interests must be weighed against the interests of the defendant to preserve whatever good will he has acquired by selling his goods under the name and marks he has adopted."

█ As to the possibility of plaintiff entering the tobacco field, its managing director was able to say only this: "Although the Directors of our Company have no immediate plans to sell cigarettes under our 'Kent' trademark, we cannot say that we shall never do so, or that we shall not do so in the reasonably foreseeable future. In view of the recent trends in merchandising in the United States, one cannot say with certainty what sound business judgment will dictate for us or our successors to do in the next ten or even five years."

This guarded and somewhat equivocal statement is no evidence of an intention to go into the tobacco field. Plaintiff must say what it will do, rather than what it cannot say it will never do.[28]

█ On the issue of tarnishment, plaintiff's position is it might suffer injury because of the appearance of the name "Kent" on a cigarette—that many people violently dislike cigarettes.[29] Plaintiff suggests, if I understand its position, that those persons who find cigarettes of any kind distasteful per se would not buy its brushes if they thought it was also producing cigarettes. This conjecture seems to me fanciful. The day has long passed when cigarette smoking is considered offensive and sinful. Changing mores in large part have removed this

attitude so that those who still object to the sale or use of cigarettes constitute an infinitesimal portion of the population. The possibility of boycotting plaintiff's products because "Kent" appears on cigarettes scarcely exists. Incidentally, there is some inconsistency in plaintiff's position; if tarnishment may result because, as plaintiff puts it, of "violent dislike" of cigarettes by some persons in the community, would not the same tarnishment follow if plaintiff attempted to expand its activities into the tobacco field?

Thus, whether a finding of likelihood of confusion is a condition precedent to legal protection of plaintiff's tarnishment and expansion interests, as the cases seem to indicate, or whether they may be protected absent such a finding, the conclusion is the same for upon the facts presented neither interest justifies relief.

█ There remains one other contention—based upon what has been referred to as the dilution doctrine. Plaintiff's complaint here is that eventually the public will come to associate "Kent" with cigarettes alone—that constant consumer association of "Kent" with cigarettes through defendant's wide sales and advertising will vitiate what identification plaintiff has built up through the years of "Kent" with brushes. So, the plaintiff argues that notwithstanding the absence of competition, confusion, either actual or potential, fraud, tarnishment or expansion purpose, it is entitled to relief. The dilution doctrine has been advanced in a number of decisions and by text-writers.[30] Its underlying rationale is that the gradual dimunition or whittling away of the value of a trademark, resulting from extensive use by another of a mark identical or similar to that of the senior user, constitutes an invasion of the senior

28. See S. C. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427, 429: " * * * [I]f the first user's interest in maintaining the significance of his name when applied to the new goods is nothing more than the desire to post the new market as a possible preserve which he may later choose to exploit, it is hard to see any basis for its protection."

29. Plaintiff has stipulated that "Kent" cig-

arettes are not inferior to other popular brands.

30. Philadelphia Storage Battery Co. v. Mindlin, 163 Misc. 52, 296 N.Y.S. 176; Tiffany & Co. v. Tiffany Productions, 147 Misc. 679, 264 N.Y.S. 459, affirmed 262 N.Y. 482, 188 N.E. 30; Schechter, "The Rational Basis of Trademark Protection," 40 Harv.L.Rev. 813, 825 (1927); 3 Callman, Unfair Competition and Trademarks, page 1644.

user's property right in his trademark and gives rise to an actionable wrong. The wrong, under this theory, is not dependent upon a showing of competitive relationship of the products or likelihood of confusion. Judge Learned Hand has referred to it as the economic interest which a senior user has in his mark outside the field of his own exploitation. While recognizing this right in the oft-quoted Yale Electric Corp v. Robertson [31] it is significant that Judge Hand noted, "And so it has come to be recognized that, *unless* the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." [32] Thus, it appears that we come back to the point from which we started—the element of likely confusion must be present. Nor do I find that the dilution doctrine has been accepted as unqualifiedly as the plaintiff urges. Analysis of the authorities, at least those in this circuit and in the New York State courts, demonstrates that in each instance it was hinged to a factual situation which involved either likelihood of confusion, tarnishment, reasonable likelihood of expansion by plaintiff to include the junior product, diversion of trade or other direct injury. But these elements are absent in this case.

The "twenty surname cases" cited by plaintiff as compelling injunctive relief must be viewed against the recent determination by the Court of Appeals for this circuit in the Hyde Park case [34]. There the Court held the defendant's use of the trademark "Hyde Park" in manufacturing and selling women's coats and suits did not constitute unfair competition with the plaintiff who used the same mark in the selling of men's suits. Although the products were related, no actual confusion as to the source of the products or palming off was found to exist. Clearly the facts were much stronger for relief than those presented in the case before me, yet relief was denied. [35] In any event the "twenty cases" possess crucial factual differences. In some, the relationship between the products was not remote; [36] in others, the defendant could advance no credible good faith reason for using plaintiff's name; [37] In still others, plaintiff's product was associated with his name by a large percentage of the consuming public. [38]

In summary, upon the record before me I find (1) no fraudulent intent by the defendant in the adoption of the name "Kent" for its new filter cigarette; (2) no confusion, either actual or likely; (3) no tarnishment of plaintiff's product; (4) no likely expansion by plaintiff into the tobacco field in the foreseeable future. Accordingly, plaintiff's motion for summary judgment is denied. The defendant's cross-motion for summary judgment on the counterclaim is granted.

Settle order on notice.

31. 2 Cir., 26 F.2d 972, 974.

32. Emphasis supplied.

34. 204 F.2d 223.

35. It may be noted that Judge Clark in his vigorous dissenting opinion stated the issue: "Does the defendant's use of the name confusingly mislead purchasers as to the source of the goods?" 204 F.2d at page 228.

36. E.g., Long's Hat Stores Corp. v. Long's Clothes, 224 App.Div. 497, 231 N.Y.S. 107; John Forsythe Co. v. Forsythe Shoe Corp., 234 App.Div. 355, 254 N.Y.S. 584; S. C. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427; Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 34 F.2d 774.

37. E.g. Alfred Dunhill of London v. Dunhill Shirt Shop, D.C., 3 F.Supp. 487; Ronson Art Metal Works v. Fink, 70 N.Y.S.2d 196; Armour & Co. v. Master Tire & Rubber Co., D.C., 34 F.2d 201.

38. E.g., Wall v. Rolls-Royce of America, 3 Cir., 4 F.2d 333; Bulova Watch Co. v. Stolzberg, D.C., 69 F.Supp. 543; E. I. Du Pont De Nemours & Co. v. Du Pont Safety R. Co., Del.Ch., 82 A.2d 384; Ford Motor Co. v. Ford Insecticide Corporation, D.C., 69 F.Supp. 935.