**FIELD ENTERPRISES EDUCATIONAL CORPORATION, Plaintiff,**

v.

**GROSSET & DUNLAP, INC. and Wonder Books, Inc., Defendants.**

No. 62 Civ. 835.

United States District Court
S. D. New York.

July 14, 1966.

**384**

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff. Jay H. Topkis, Allan Blumstein, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants. Edward C. Wallace, Marshall C. Berger, New York City, of counsel.

## OPINION

BONSAL, District Judge.

In this action, tried before the court, plaintiff seeks an injunction and ac- counting for unfair competition and for willful infringement of its registered trademark, "How and Why," and defendants counterclaim for judgment declaring plaintiff's trademark invalid.

Plaintiff is a Delaware corporation; defendant Grosset & Dunlap, Inc. (Grosset) is a New York corporation; and defendant Wonder Books is a division of Grosset. Plaintiff and defendants are engaged in publishing and selling children's books.

### Plaintiff's Books

Beginning in 1931, L. J. Bullard Company (Bullard), plaintiff's predecessor in interest, published and sold a series of children's books under the title, "The How and Why Library." The series consisted initially of three books, subsequently expanded to five, and in 1955 to six by the addition of a dictionary. The series was sold only in sets and was priced at $19.95 for the three-volume set, $34.90 for the five-volume set, and $45.90 to $69.90 for the six-volume set.

Bullard distributed its books through salesmen to parents and schools, employing approximately 350 salesmen on a year-round basis and adding some 150 to 200 school teachers during the summer months. Bullard did not advertise, except to exhibit its series at national and local conventions of teachers' organizations and at state fairs, flower shows, boat shows, and the like. In addition, in had a booth at the Century of Progress Exposition in Chicago in 1933 and at the New York World's Fair in 1939, where the series was displayed.

Between 1947 and 1960, Bullard sold from 8,000 to 12,000 sets of "The How and Why Library" annually. Its total dollar sales for the five years ending in 1959 were $2,900,000., 75% of which were attributable to "The How and Why Library" series.

On July 25, 1960, plaintiff entered into a contract with Bullard for the purchase of its business and assets for $197,600., and the purchase was closed on August 1. In August 1960 plaintiff applied, pursuant to the Lanham Act, to the Com-

missioner of Patents for registration of the trademark, "How and Why," for a series of books, including a dictionary, and on June 13, 1961 the trademark was registered.

Plaintiff received from Bullard 6,500 sets of "The How and Why Library." Plaintiff sought to sell the sets at $29.95 each and mailed 400,000 direct solicitations for that purpose. Plaintiff sold 819 sets of the series between August 1, 1960 and September, 1962 (of which 200 were resold to Bullard to satisfy Bullard orders). The dollar volume of these sales was approximately $20,000.

Between September 1962 and October 1963, plaintiff revised "The How and Why Library" into a new 15-volume series of children's books to be published under the name, "Childcraft, The How and Why Library." On October 1, 1963 plaintiff undertook a pre-publication sale of the revised series, the official publication date being January 2, 1964. The series is a reference work sold only in sets at a price of $129.00 ($75.00 if sold to schools) and is directed primarily to pre-school and primary grade children. For older children through the high school level, plaintiff publishes its World Book Encyclopedia, the World Book Atlas, and the World Book Encyclopedia Dictionary.

Plaintiff distributes all its publications by direct sales to parents and schools and maintains a sales force of approximately 70,000, 60,000 of whom (primarily teachers) work on a part-time basis. Plaintiff's advertising and promotional expenditures run approximately $3,000,000 a year, of which approximately 30% is allocable to "Childcraft, The How and Why Library." Plaintiff attempts, whenever possible, to sell its several publications as a unit and offers substantial discounts to purchasers who take the World Book Encyclopedia as well as the "Childcraft" series.

In the fiscal year ending September 1964, plaintiff sold approximately 140,-000 sets of "Childcraft, The How and Why Library," the dollar volume totalling approximately $11,000,000. In its 1965 fiscal year plaintiff sold approximately 150,000 sets with a dollar volume of $12,000,000.

### Defendants' Books

In 1959, defendants were considering the publication of a popularly priced and mass distributed series of children's books to capitalize on the revival of interest among young readers in scientific subjects, which they believed had resulted from the launching of the first Sputnik by the Russians.

In March 1959, a meeting of the Editorial Board of Wonder Books was held to consider such a series. At the meeting, the format was discussed and it was agreed that the series should consist of a number of individual titles on specific subjects. Each book would consist of a continuous narrative in which questions on the subject thought to be most often asked by children would be posed and answered. Mr. Siwek, president of Wonder Books, suggested the name "How and Why" as a title for the series, which he believed described its purpose. The testimony indicates that none of those attending the meeting had heard of or seen the Bullard series or any other books using the title "How and Why."

In April and May, 1959, defendants caused a "title" search to be made on "How and Why." Their counsel advised them of at least three other series of children's books and of a number of individual titles using "How and Why," including Bullard's "The How and Why Library." Counsel appeared most concerned by the "How and Why Series" edited by Gerald Bullett, published by A. & C. Black, London, and distributed in the United States by Macmillan Company. Defendants decided to add the word "Wonder" and to publish their series under the title—"How and Why Wonder Books."

Defendants began publication of "How and Why Wonder Books" in March 1960. Wonder Books distributed 50-cent paperback editions through mass distribution channels, such as supermarkets, newsstands, drug stores, and the like. Grosset distributed hard-cover editions at

$1.00 through book stores and other traditional channels. The content of the Wonder Books and Grosset editions was the same, the only difference being the covers.

Shortly after distribution of "How and Why Wonder Books" commenced, defendants received a letter dated May 4, 1960 from Loren J. Bullard, Jr., president of Bullard, plaintiff's predecessor, which questioned the defendants' publication of a series entitled "How and Why." Counsel for defendants replied on May 6 that the series was actually called "How and Why Wonder Books." Mr. Bullard then wrote defendants' counsel on May 9, 1960 that:

"It is our opinion that if HOW AND WHY, WONDER BOOKS had been used, that there would be no problems or questions concerning it and we suggest that you contact your client and advise them that the HOW AND WHY, WONDER BOOKS is acceptable, but certainly not the HOW AND WHY BOOKS, the HOW AND WHY SERIES, etc."

On June 2 defendants' counsel wrote Bullard that the first six titles of the Grosset series had been distributed under the title "How and Why," but that future printings of those six titles and all new titles published by Grosset would be called the "How and Why Wonder Books." When the contract between plaintiff and Bullard was closed on August 1, 1960, plaintiff had been informed of this correspondence.

Each of the first six Grosset editions printed under the name "How and Why" had a printing of 49,500 copies and approximately 200 copies of each edition had been distributed before the mistake was discovered. Defendants say it would have been impossible to change the title on these editions and they made no attempt to recall the copies already

distributed or to stop distribution of the copies on hand. All subsequent editions have been printed and distributed as "How and Why Wonder Books."

Since 1960, defendants' series (both Grosset and Wonder Books) has expanded to more than 60 separate titles in the fields of science, history, nature, and the like. The series was originally designed for the 7 to 12 age group, but later titles have been written for the 10 to 14 years age group. Defendants have expended substantial sums of money in advertising and promoting their "How and Why Wonder Books" and have sold more than 22,000,000 copies.

### Preliminary Matters

■ Before considering the merits of plaintiff's claims of unfair competition and trademark infringement, two preliminary matters may be disposed of summarily. First, defendants contend that plaintiff's failure to distribute books under the title "How and Why" between September 1962 when they stopped selling Bullard's "How and Why" books and October 1963 when they brought out their new series constitutes an abandonment of its trademark.[1] Between September 1962 and October 1963 plaintiff was developing its own "Childcraft" series to incorporate material from the Bullard volumes and commenced pre-publication sale of "Childcraft, The How and Why Library" on October 1, 1963. The lull in plaintiff's activities and its difficulty in disposing of the Bullard inventory are relevant to a consideration of the strength of plaintiff's trademark, which is discussed later on in this opinion. But these facts do not establish an abandonment. See, 3 Callmann, Unfair Competition and Trademarks (2d ed. 1950), § 79 et seq. and cases cited therein.

[1]. Defendants did not press this argument either at trial or in their briefs, and have cited no authority to support it. The facts show that plaintiff mailed approximately 400,000 circulars between August 1960 and September 1962 in an attempt to dispose of Bullard's inventory of "The How and Why Library." In this period plaintiff sold 619 sets at a price of $29.95 per set for a total dollar volume of approximately $20,000.

The second preliminary contention advanced by the defendants arises by reason of the Bullard letter of May 9, 1960 hereinbefore referred to. Mr. Bullard, president of plaintiff's predecessor, wrote to defendants' counsel indicating that the title HOW AND WHY WONDER BOOKS would be acceptable, and this information was made available to plaintiff at or prior to the closing. If the evidence supported defendants' contention that they relied on Mr. Bullard's letter in publishing their series, there might be a basis for defendants' contention that his letter acted as an estoppel. However, the evidence is to the contrary. Defendants made a prior decision, based on advice of counsel, to publish their "How and Why Wonder Books," the format of which was not seen by Mr. Bullard. The Bullard letter attracted defendants' attention to their failure to include "Wonder" in the first six titles, but this was described by defendants' president as an "unfortunate" oversight. At no time did defendants rely on the Bullard letter in planning and publishing their series. Therefore,

while the Bullard letter may bear on the issue of "likelihood of confusion" (see, Application of National Distillers & Chemical Corp., 297 F.2d 941, 49 CCPA 854 (1962)), it does not constitute an estoppel. Compare, Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 190 N.Y. S.2d 977, 161 N.E.2d 197 (1959).

### Plaintiff's Claim of Trademark Infringement

The test of infringement of plaintiff's trademark is whether the defendants' use of "How and Why Wonder Books" is likely to cause confusion or mistake or to deceive purchasers as to source or origin (15 U.S.C. § 1114(1)).[2]

Both plaintiff and defendants are engaged in publishing and selling children's books and, though no direct evidence was offered, it may be inferred from the evidence that there is some overlapping of competition between plaintiff's and defendants' publications. However, the appearance[3] and content of the plaintiff's and defendants' books, the manner of distribution and the prices charged, are completely different. The

2. § 1114.
   "(1) Any person who shall, without the consent of the registrant—
   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
   (b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
   shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive."

3. The covers of plaintiff's "Childcraft" books are predominantly gray in color, with the word "Childcraft" prominently written on the spine and face of each volume and emphasized by a different color. "The How and Why Library" appears in much smaller print on the face of the cover, but not on the spine. The same emphasis of "Childcraft" appears on the title page. The "Childcraft" books are expensively bound, are printed on a high quality paper, and are over 300 pages in length.
   The covers of defendants' "How and Why Wonder Books" are made up of color pictures relating to the contents of the volume. A box in the upper left hand corner sets out the legend, "The HOW AND WHY Wonder Book of," and the title of each book is set in larger print adjacent to the box, i. e., THE FIRST WORLD WAR, ELECTRICITY, and the like. On the title page, the title of the particular volume is similarly emphasized. The "How and Why Wonder Books" are inexpensively bound and printed and run 48 pages in length.

plaintiff's series is sold only in sets through its salesmen at a price of $129.-00. Defendants' series is distributed through retail outlets where individual copies may be purchased for 50 cents (Wonder Books) or $1.00 (Grosset). The plaintiff's series is designed for pre-school and primary grade children, whereas defendants' books are addressed primarily to 7 to 14 year old children. The plaintiff's series is a reference work for children, while defendants' series are general trade or library books for children.

■ Where such differences exist, the possibility of overlapping areas of competition or the "proximity of the products" in the course of distribution are only two factors to consider in determining whether there is a likelihood of confusion as to the source of the products. Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961); Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1964). Other factors to be considered are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the likelihood that the plaintiff will expand into the defendants' market; (4) actual confusion; (5) the defendants' good faith in adopting the mark; (6) the quality of defendants' product; and (7) the sophistication of the buyers. Polaroid Corp. v. Polarad Electronics Corp., supra; Restatement, Torts 2d, §§ 729, 731 (Tent. Draft No. 8) (April, 1963)

■ As to the strength of plaintiff's mark, since "How and Why" is a common English phrase it may not be protected in the absence of secondary meaning. W. E. Bassett Co. v. Revlon, Inc., 354 F.2d 868, 871 (2d Cir. 1966); Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688 (2d Cir. 1938); Compare, Keller Products, Inc. v. Rubber Linings Corp., 213 F.2d 382, 47 A.L.R.2d 1108 (7th Cir. 1954). While it is desirable to protect a person who has built up a public association with certain products under his trademark from having his business taken by someone else,

it is undesirable to block the channels of expression by giving protection to everyone who may go out and appropriate an ordinary descriptive word for his own business use. Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 865 (S.D.N.Y.1962), aff'd, 312 F.2d 125 (2d Cir. 1963); Q-Tips, Inc. v. Johnson & Johnson, 206 F.2d 144, 146 (3d Cir. 1953), cert. denied, 346 U.S: 867, 74 S. Ct. 106, 98 L.Ed. 377 (1953). Therefore, plaintiff must prove that "How and Why" has acquired a secondary meaning, has become known in the marketplace as the name of books coming from a particular source. See, Restatement, Torts 2d, § 716 (Tent. Draft No. 8) (April, 1963); 3 Callmann, Unfair Competition and Trademarks, §§ 77.1–77.3 (2d ed. 1950).

As evidence of secondary meaning, plaintiff established that Bullard sold 8,000 to 12,000 sets of its "The How and Why Library" annually from 1947 to 1960 and that the total dollar sales for the five years ending in 1959 was $2,-900,000; that the "Booster Book" used in promoting the Bullard series contained numerous letters indicating that "The How and Why Library" had been favorably received in many areas; and that in 1964 and 1965 plaintiff expended approximately $2,000,000 in promoting and advertising its series, "Childcraft, The How and Why Library," and sold approximately 290,000 sets.

■ Defendants introduced editions of and supplements to The United States Catalog, Books in Print from 1912 to 1965, listing numerous uses of "How and Why" in the titles of books such as: "How and Why of Electricity," "How and Why of Life," "How and Why Stories," "How and Why We Live," and the like. Defendants also established that L. W. Singer Company (Syracuse, N. Y.) published a series of children's books entitled "The How and Why Science Series," selling 7,240,864 copies between 1937 and 1965. Defendants have expended large sums in advertising their own series and have sold over 22,000,000 copies of "How and Why Wonder Books"

since 1960. On these facts, plaintiff has not proven that a secondary meaning exists with respect to "How and Why" used with its books or with those of its predecessor Bullard.[4]

■ Plaintiff urges that "How and Why" as used by its predecessor Bullard and by it is arbitrary and fanciful and not generic and descriptive. The phrase is not the title of any book in the series and does not describe the content of any book in the series, and plaintiff says it is used non-descriptively to identify the origin of the series as a whole. See, Application of Cooper, 254 F.2d 611, 45 C.C.P.A. 923 (1958); Whitman Pub. Co. v. McLoughlin Bros., 97 F.2d 608 (C.C. P.A.1938); 3 Callmann, Unfair Competition and Trademarks, § 71.1(e) (2d ed. 1950). In view of the provisions of the Lanham Act (15 U.S.C. § 1057(b)) making registration of a trademark *prima facie* evidence of its validity, the plaintiff's argument has sufficient merit to warrant dismissal of defendants' counterclaim for a judgment declaring the trademark invalid. However, taking all the factors into consideration, it does not alter the court's finding as to the weakness of the plaintiff's mark.[5] This weakness is further pointed up when defendants' use of "How and Why" is considered. The defendants use the title "How and Why Wonder Books" to promote their series as a whole and to indicate its source. But each book in the series sets forth many of the "hows and whys" of a particular subject and in their promotional material defendants state that the books "answer the questions most often asked by today's boys and girls * * *."

As stated in Jean Patou, Inc. v. Jacqueline Cochran, Inc., supra, 201 F.Supp. at p. 865:

"The use of a word such as "joy" which is in the public domain is only unfair when a competitor uses it in its trade-mark or secondary sense. The competitor is free to use the word in its common or primary sense. The utmost that the plaintiff here may insist upon is that no one use its mark in an unfair way."

Also, see 3 Callmann, Unfair Competition and Trademarks, § 71.1(e) (2d ed. 1950), at p. 1086.

■ Since the court finds that there is no likelihood of confusion as to the source or origin of plaintiff's and defendants' books, it is unnecessary to decide whether defendants' use of "How and Why" is primarily fanciful or primarily descriptive. It will be noted that Mr. Siwek, president of Wonder Books, originally suggested the use of "How and Why" as a title because he thought that it accurately described the nature and content of the series the defendants were about to publish.

■ The defendants' good faith in adopting the "How and Why" mark is another factor to be considered in determining "likelihood of confusion." Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp., 308 F.2d 196 (2d Cir. 1962). The court accepts the testimony of defendants' officers and employees that at the editorial board meeting in March, 1959, the phrase "How and Why" was adopted without knowledge of its use by Bullard. As noted above, Mr. Siwek tes-

---

4. It is noted that Bullard took no action to prevent the numerous uses of "How and Why" in the titles of books, particularly its use by L. W. Singer Company, and that plaintiff in promoting "Childcraft, The How and Why Library" often refers to it only as "Childcraft."

5. In the contract under which plaintiff purchased the business of Bullard in 1960 for $197,600, and despite the high volume of prior sales of "The How and Why Library," only $20,000 was allocated for "the name THE HOW AND WHY LI-

BRARY, all good will attaching thereto, all rights to use such name and substantially similar names containing the words "How" and "Why" as applied to books * * * adaptable for use by children * * * and all trade-marks and trade-mark rights, whether common law or statutory, owned by Seller [Bullard] with respect to such name * * *." Plaintiff paid $22,000 for all copyrights, $21,600 for plates and standing type and rights thereto, and $104,000 for "The How and Why Library" on hand.

tified that he suggested "How and Why" as a title because he thought that it accurately described the purpose of the books—to pose and answer questions on particular subjects thought to be most often asked by younger readers.

Defendants learned of the Bullard series as early as April 1959, when they received a report of the trademark search conducted by their counsel. As a result of this report and of further communications with counsel, defendants added "Wonder Books" to the title of their series, presumably with a view to avoiding conflicts with other users of "How and Why." See, Avon Periodicals, Inc. v. Ziff-Davis Pub. Co., 27 Misc.2d 160, 113 N.Y.S.2d 737, 742 (N.Y.Sup.Ct.1952), rev'd on other grounds, 282 App.Div. 200, 122 N.Y.S.2d 92 (1953). As evidence of bad faith, the plaintiff asserts that defendants arranged the title on their editions in a manner similar to that used by Bullard. But this arrangement is not so similar as to give rise to such an inference. Defendants' officers responsible for the "How and Why Wonder Books" testified that they had not seen the Bullard series prior to publication.

Defendants have expended large sums of money in promoting, advertising and distributing the "How and Why Wonder Books." See, G. B. Kent & Sons v. P. Lorillard, 114 F.Supp. 621 (S.D.N.Y. 1953), aff'd, 210 F.2d 953 (2d Cir. 1954). Defendants have not relied on the reputation created by another to reap a commercial advantage. As stated in *Triumph Hosiery Mills*, supra, 308 F.2d at p. 199:

> "An 'innocent' or a bona fide junior user, in the sense of Johnson and Avon Shoe, is one, we think, whose use is not attributable to intent to obtain a free ride on the reputation of the owner of the trademark."

Nothing in the record supports a finding that defendants were seeking to obtain a free ride on the reputation of plaintiff or of its predecessor, Bullard.

In view of the many dissimilarities between plaintiff's and defendants' products, the weakness of the plaintiff's trademark, and the defendants' good faith, the court finds that a likelihood of confusion, if it exists at all, is *de minimis*. See, *Triumph Hosiery Mills*, supra. Any instances of actual confusion should have been readily ascertainable by plaintiff, but none were shown at the trial. Moreover, plaintiff publishes the World Book Encyclopedia for intermediate grade and high school children and cannot claim that defendants' series will hinder it in expanding "Childcraft" to appeal to the 7 to 14 year old market. See, Chandon Champagne Corp., supra; G. B. Kent, supra. Finally, although defendants' series is moderately priced, the content of their books is of good quality. See, Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607 (2d Cir. 1960). Taking all factors into consideration, plaintiff has not established a "likelihood of confusion" between plaintiff's and defendants' books.

### Plaintiff's Claim of Unfair Competition

The test of unfair competition again is likelihood of confusion, (*Avon Shoe Co.*, supra, at p. 614). "Taking the total effect of defendant's product upon the eye and mind of the prospective purchaser, will there be a confusion of origin?" *Jean Patou, Inc.*, supra, 201 F.Supp., at 866. The relevant considerations are similar to those applied in determining trademark infringement. See, Dell Pub. Co. v. Stanley Pub., Inc., 9 N.Y.2d 126, 211 N.Y.S.2d 393, 172 N.E. 2d 656 (1961).

In view of the findings as to the dissimilarities between the books, the weakness of the plaintiff's mark as an indication of source of origin, and the defendants' good faith in adopting their mark, plaintiff has failed to establish unfair competition. Nor, in the absence of a showing of likelihood of confusion or unfair intent on defendants' part, can the plaintiff assert a right to relief under the New York anti-dilution statute, General Business Law, McKinney's Consol.Laws, c. 20, § 368-d. Cue Publishing Co. v. Colgate-Palmolive Co., 45 Misc.2d

161, 256 N.Y.S.2d 239 (N.Y.Sup.Ct. 1965), aff'd, 23 A.D.2d 829, 259 N.Y.S. 2d 377 (1965).

The court holds that plaintiff's trademark has not been infringed by the defendants, nor have the defendants been guilty of unfair competition. Defendants, however, have not established that plaintiff's trademark is invalid. Defendants did not press this point either in their briefs or at trial. As noted above, registration under the Lanham Act is *prima facie* evidence of validity (15 U.S.C. § 1057(b)) and cases such as Application of Cooper, supra, support plaintiff's contention that descriptive marks can be used non-descriptively.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P. Accordingly, the clerk may enter judgment in favor of the defendants on the complaint, and judgment for the plaintiff dismissing defendants' counterclaim.

It is so ordered.